UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | | |
|---|---|---|
| STAN COOPER and NEERAJ METHI, | ) | |
| Individually and On Behalf | ) | CASE NO.: |
| of All Others Similarly Situated, | ) | |
| | ) | <u>CLASS ACTION</u> |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR VIOLATIONS OF** |
| | ) | **THE FEDERAL SECURITIES LAWS** |
| DJSP ENTERPRISES, INC; DAVID J. STERN; | ) | |
| and KUMAR GURSAHANEY, | ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | ) | |
| | ) | |

Plaintiffs Stan Cooper and Neeraj Methi, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation of Plaintiffs' counsel, which includes without limitation: (a) review and analysis of regulatory filings made by DJSP Enterprises, Inc. ("DJSP" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by DJSP; and (c) review of other publicly available information concerning DJSP.

<u>**NATURE OF THE ACTION AND OVERVIEW**</u>

1.      This is a securities class action filed on behalf of purchasers of DJSP's securities between March 16, 2010 and May 27, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     DJSP is one of the largest providers of processing services for the mortgage and real estate industries in Florida and the United States.  Through its three operating subsidiaries, the Company provides non-legal services that are ancillary to and support the residential real estate foreclosure market, other related legal actions and lender owned real estate ("REO") services.  These services are provided almost exclusively to the Law Offices of David J. Stern ("DJS"), which provides residential foreclosure work for approximately 12 loan servicing firms. DJS's clients include all of the top 10 and 17 of the top 20 mortgage servicers in the US. Consequently, DJSP provides its services to these same mortgage servicers through an agreement between DJSP and DJS.

3.     DJS is a law firm founded and solely owned by David J. Stern ("Stern"), who is also the President and Chief Executive Officer ("CEO") of DJSP.  According to the Company's Form 20-F filed with the Securities and Exchange Commission ("SEC") on April 2, 2010, DJS is the Company's primary client and any change in the volume of foreclosures referred to DJS by its clients would necessarily and materially affect the financial performance of DJSP.

4.     On March 16, 2010, DJSP filed a 6-K with the SEC in which it touted the quarterly results it announced on March 11, 2010, reaffirmed its previously-announced guidance, and also indicated that no matter what the Obama Administration does to slow down foreclosures, they have found the "way to create a profit center on it. . . ."

5.     In April 2010 one of DJS's largest clients began a foreclosure system conversion that resulted in a substantial decrease in the volume of foreclosures referred to DJS for April and May 2010.  This was significant because DJSP relied heavily on the providing of ancillary services to DJS to generate its revenue. Despite knowing that DJSP generates a significant amount of its revenue from flat fees earned within the first month of a referral and that any

2

significant decrease in referrals would materially and adversely affect its revenues, DJSP did not publicly disclose the substantial slowdown in foreclosure referrals or the slowdown due to governmental intervention programs until May 27, 2010.

6.      The adjusted closing price for DJSP shares on May 27, 2010 was $8.87 per share on a volume of 412,500 shares trading.  Trading of DJSP shares opened on May 28, 2010 at $6.33 per share and closed at an adjusted price of $6.38 per share on a volume of 4,931,300, representing a drop of nearly 29%.  As of April 2, 2010, the Company had 9,166,666 shares outstanding; thus approximately 54% of the Company's outstanding shares were traded following the revelation on May 27, 2010 that there would be a substantial decrease in the number of residential foreclosure cases to DJS and subsequently to DJSP.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

10.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information,

occurred in substantial part in this Judicial District.  Additionally, the Company's principal executive offices are located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Plaintiff Stan Cooper, as set forth in the accompanying certification, incorporated by reference herein, purchased DJSP's securities at an artificially inflated price during the Class Period and has been damaged thereby.

13.     Plaintiff Neeraj Methi, as set forth in the accompanying certification, incorporated by reference herein, purchased DJSP's securities at an artificially inflated price during the Class Period and has been damaged thereby.

14.     Defendant DJSP is a British Virgin Islands Company.  DJSP was incorporated on February 19, 2008, under the name "Chardan 2008 China Acquisition Corp." ("Chardan 2008") as a blank check company for the purpose of acquiring, engaging in a merger or share exchange with, purchasing all or substantially all of the assets of, or engaging in a contractual control arrangement or any other similar business combination with an unidentified operating business which has its principal business and/or material operations in China.  DJSP's principal place of business is 900 South Pine Island Road, Suite 400, Plantation, FL 33324.

15.     Defendant David J. Stern, at all times relevant hereto, was the Chairman of the Board of Directors, President, and CEO of DJSP.  Stern is also the founder and sole owner of DJS, Stern Holding Company – PT, Inc. (f/k/a Professional Title and Abstract Company of

Florida, Inc.) ("PTA") and Stern Holding Company – DS, Inc. (f/k/a Default Servicing, Inc.) ("DSI").

16. Defendant Kumar Gursahaney ("Gursahaney"), at all times relevant hereto, was the Executive Vice President and Chief Financial Officer ("CEO") of the Company. Defendants Stern and Gursahaney are collectively referred to as the "Individual Defendants." Defendants DJSP, Stern, and Gursahaney are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### DJSP History and Organization

17. DJSP is a British Virgin Islands company, which, according to the Company's Form 20-F filed with the SEC, "was incorporated on February 19, 2008, under the name 'Chardan 2008 China Acquisition Corp.' as a blank check company for the purpose of acquiring, engaging in a merger or share exchange with, purchasing all or substantially all of the assets of, or engaging in a contractual control arrangement or any other similar business combination with an unidentified operating business which has its principal business and/or material operations in China."

18. On August 11, 2008, Chardan 2008 consummated an initial public offering of 6,875,000 units, with each unit consisting of one ordinary share and one redeemable ordinary share purchase warrant. Each warrant entitled the holder to purchase from Chardan 2008 one ordinary share for $5.00. There are currently 9,166,666 shares outstanding.

19. In the aftermath of the global financial crisis in 2008, Chardan 2008's management concluded that US equity markets would be unreceptive to a business combination with a Chinese company. As a result, on January 15, 2010, Chardan 2008 entered into a transaction with an entity known as DAL Group, LLC ("DAL") (the "Transaction"). Through

the Transaction, Chardan 2008 acquired a controlling interest in DAL for $64.8 million in cash. DAL assumed $4.1 million of Chardan 2008's debt.

20.     Also as part of the Transaction, DJSP became a 71% owner of DAL.  DJSP became a holding company whose primary business operations are conducted through three wholly-owned subsidiaries of DAL, which are: (i) DJS Processing, LLC ("DJS LLC"); (ii) PTA; and (iii) DSI.  The organizational structure of DJSP is as follows:



21.     It is through DJS LLC, PTA and DSI that DJSP conducts its operations.  DJSP's operations include foreclosure services, title services, bankruptcy services, eviction services, REO closing services, REO liquidation services, loss mitigation, monitoring services and litigation services.  These services are all ancillary to the residential real estate foreclosure process and are provided by DJSP to its sole customer DJS.

**DJS History and Organization**

22.     DJS was founded by Stern in 1994 and provides its clients with legal services and related non-legal support in connection with residential foreclosures, bankruptcy, complex litigation, evictions and the sale of REO properties by foreclosing lenders in connection with legal matters handled by DJS.  Contemporaneously with the consummation of the Transaction, DJS and DJS LLC entered into a long-term Services Agreement, pursuant to which DJS engaged DJS LLC to provide substantially all non-legal support required for the legal matters handled by DJS.  For example, when DJS receives legal referrals from its clients, it will use DJS LLC to, among other things, prepare drafts of pleadings and documentation for such clients.  At the time of closing of the Transaction, DJS was DJS LLC's sole customer.

**Relationship Between DJSP and DJS**

23.     On January 15, 2010, DJS LLC and DJS entered into a Services Agreement, whereby DJS agreed to use DJS LLC to provide all non-legal support required for the legal matters handled by DJS.  Thus, DJSP has few or no clients of its own, other than DJS, and relies almost exclusively on referrals from DJS for its continued viability.

24.     The Company's April 2, 2010 Form 20-F demonstrates that its financial results are inextricably tied to its relationship with DJS, and in particular, Stern himself.  For example, the Company's Form 20-F states:

> **David J. Stern plays a critical role in our success and the success of DJS. Should Mr. Stern become incapacitated or die, it is likely that our business and results would be adversely affected to a significant degree.**
>
> Although we and DJS each have substantial management teams that are capable and experienced, the majority of the client relationships of DJS and our customer relationships were established and continue to be managed by Mr. Stern.  If Mr. Stern becomes unable to perform his duties under his employment

agreement or dies, it is possible that the client relationships of DJS, and therefore the volume of referrals that we receive from DJS, would suffer, materially reducing our revenues and profitability.

*       *       *

**If the number of case files referred to us by DJS, which is our principal foreclosure processing service law firm client, do not increase, our operating results and ability to execute our growth strategy could be adversely affected**.

We have one law firm customer in Florida, DJS. Each foreclosure, bankruptcy, eviction, litigation, and other mortgage default related case file referred to DJS will typically have a fixed fee associated with it that is based on a schedule established by government sponsored entities, such as Freddie Mac and Fannie Mae. We are paid a fixed fee by DJS for the services we render to DJS. Therefore, the success of our mortgage default processing services business is tied to the number of these case files that DJS receives from its mortgage lending and mortgage loan servicing firm clients and our ability to control costs. There is little or no opportunity for us to increase revenues on a per file basis unless the fee schedule that DJS has with its clients is adjusted upward. Such upward adjustments may or may not keep pace with increases in our costs. Because DJS receives a fixed fee from its clients, it has limited financial ability to pay increased fees to us. As a result, if the number of referrals that we receive through DJS decreases, it would likely result in a decrease in our revenues and profits.

*       *       *

**The majority of file referrals to DJS come from fewer than a dozen lenders and loan servicing firms. If DJS were to lose any of these sources of business, in whole or in part, it would adversely affect our financial performance.**

In 2009, the top ten clients for DJS, on an aggregate basis, accounted for 89.5% of case files referred to DJS for mortgage default and other processing services, and its largest single customer accounted for 30% of DJS' total foreclosure file volumes for the same period. Our operating results and ability to execute our growth strategy could be adversely affected if (i) our current law firm customer, DJS, loses business from these clients; (ii) these clients are affected by changes in the market and industry or other factors that render them unable to pay for the services we have rendered; or (iii) our law firm customer is unable to attract

additional business from current or new clients for any reason, including any of the following: a decline in the quality of legal services provided, the loss of key attorneys (such as David J. Stern, who has developed and maintains a substantial amount of DJS' client relationships), the desire of the law firm's clients to allocate files to other firms or among a larger number of firms, decreasing the share received by DJS, or a decrease in the number of residential mortgage foreclosure actions that customers initiate in Florida, our principal market, whether due to business considerations or governmental action impeding foreclosures. The reduction in work received from DJS or the inability or failure of DJS to pay us as a result of any one or more of these factors could materially reduce our cash flow, revenues and profits. Please refer to the risk factors below for more information about governmental or other voluntary action on the part of the clients of DJS that could negatively affect us.

25.     DJSP generates revenue by charging flat fees for the services it renders to DJS. DJSP's revenue therefore is entirely dependent upon the volume of referrals it receives from DJS, which is in turn dependent upon the number of foreclosure files that residential real estate mortgage lenders refer to DJS.

26.     The average cycle time for a residential foreclosure is approximately 12 months and DJSP earns a significant portion of its fee for its services within the first month after referral. Consequently, the volume of referrals is indicative of, and directly related to, DJSP's future revenue.

**Materially False and Misleading Statements**

27.     On February 17, 2010, DJSP issued a press release announcing its guidance for 2010.  Specifically, the Company stated that it expected to report adjusted net income of approximately $49 million and adjusted EBITDA of approximately $80.6 million, excluding a one time transaction expense associated with the Transaction.

28.     On March 11, 2010, DJSP announced quarterly revenues increased 33% to $70.5 million from $52.9 million from the first quarter of 2009 and year-to-date ("YTD") revenues increased 31% on revenue of $260.3 million.  At that time Stern stated:

> DJSP delivers unparalleled customer service by combining unique mortgage and foreclosure expertise with highly automated electronic processing. This efficiency has historically enabled us to significantly grow both our top and bottom-line results. As a public company we will be able to leverage our expertise, diversify our service offerings, and expand geographically in order to accelerate our growth and enhance our client relationships. Going forward, we are particularly excited about our REO business which will become an increasingly significant source of revenue and income growth in the coming years.

Also at this time, the Company reaffirmed its previously announced guidance for 2010, stating that it expected to report adjusted net income of approximately $49 million and adjusted EBIDTA of approximately $80.6 million, excluding the one time expense related to the Transaction.

29.     On March 16, 2010 DJSP filed a Form 6-K with the SEC and attached a copy of the presentation materials that Defendants Stern and Gursahaney made at the 22nd Annual Roth OC Growth Stock Conference held in California on that date during which he stated:

> Historical foreclosure growth, foreclosures have experienced sustained growth for over 25 years at an annual rate of approximately 12%, foreclosure volumes are expected by DJSP and by all my comps to continue to grow to historical height. Near term outlook, loans past due the leading indicator for the future foreclosures it continues to increase. **No matter what Obama rolls out, there is no stopping this inflow of continued defaults that we anticipate to go for another two or three years late behind that is the math of REO's that need to be liquidated and at the end of the day, the cycle will start again. Well, foreclosure volumes through 2012 are expected to increase dramatically and remain at high levels going on till 2017.**

*        *        *

We currently only represent one client. We expect to increase that in the year 2010 by adding one and only one additional client to achieve that 100% increase and keep in mind, we represent 17 out of the top 20 lenders in the country and we really have not solicited to this day additional REO business because we kept it under an exclusive which is no longer applicable.

*       *       *

**So no matter what the Obama administration brings our way, we have found the way to create a profit center** on it and that I think is part of the success.

*       *       *

**So I don't think we are going to see really any bumps. I think we are going to see all of the operating subsidiaries really jump out especially with what's being pushed through the systems. In my office alone, I have over 15,000 foreclosures that simply need to be set for sale.** When they are set for sale because they are under HAMP review, when they are set for sale not only do I get $250 for resetting each of them but once they are reset if when they are sold, they will go back to the GFE where under my contract I do cradle to grave then I get to do the closing on them, R250 for stock price, plus $250 for closing fee, $400 for title search, title exam, title update and then I get a right to title policy and if there is a lender involved, I get a right to lender's policy. So it all flows nicely, yes sir.

30.     Stern's presentation also included slides which reinforced his publicly made statements as to the Company's current and future business, as well as the guidance announced on February 17, 2010.  The following slides illustrated Stern's public comments:

## DJSP Highlights



- **Strong relationships with clients that are the *INDUSTRY LEADERS***
  - Includes **ALL** of the top 10, and 17 of the top 20 mortgage loan servicers in U.S
  - Long term retention of clients, many >13 years
  - Delivers unparalleled customer service by combining unique mortgage & foreclosure expertise with highly automated electronic processing

- **Highly scalable operation able to leverage existing client relationships**
  - Transition to paperless system to increase reliability, efficiency and margins
  - Recent outsourcing of labor-intensive, "back office" functions to Philippines has been successfully implemented and expanded
  - Adding new business lines and expanding geographically will accelerate growth

Nasdaq: DJSP, DJSPW, DJSPU                                                    3

**DJSP** ENTERPRISES, INC.

\*        \*        \*

## The Market: Foreclosure Volume Growth

### Historical Foreclosure Growth
- Foreclosures have experienced sustained growth for over 25 years at an annual growth rate of approximately 12%
- Foreclosure volumes are expected by DJSP management to be significant even when they revert to historical levels

### Near Term Outlook
- Loans past due, the leading indicator for future foreclosure filings, continue to increase
- As of November 2009, 1 in 4 mortgages were in arrears
- Foreclosure volumes through 2012 are expected to increase dramatically and remain elevated through 2017 (Credit Suisse "U.S. Mortgage Strategies")



U.S. Number of Foreclosures

Nasdaq: DJSP, DJSPW, DJSPU                                                    5

**DJSP** ENTERPRISES, INC.

\*        \*        \*

## The Market: Interest Rate Resets & ARMs

**Large number of loan resets through 2012 are expected to accelerate foreclosures**

- Option ARM loans enabled people to buy homes they could not afford as they featured low initial monthly payments that will reset to significantly higher monthly payments
- Resets can increase monthly payments to homeowners by >2X



**Alt-A and Option Arm mortgages written between 2005 & 2007 (worth $1.5 trillion) are expected to have ultimate default rates of >50%**

- Highest level of interest rate resets to occur during 2010 and 2011 and will remain at historically high levels well into 2012

Nasdaq: DJSP, DJSPW, DJSPU                                    6

---

* * *

## Revenue and Net Income (Actual and Projected)



Revenue

Adjusted Net Income

Notes:
- 2007, 2008 & 2009 net income numbers are adjusted to account for "add backs", including salary and other miscellaneous expenses, and assume 35% tax rate
- Net income excludes one time expenses related to the business combination with CACA

Nasdaq: DJSP, DJSPW, DJSPU                                    7



* * *

13



These slides reinforce the statements made by Defendant Stern that there were no impediments to near- and long-term growth in revenue and net income.

31.     On April 19, 2010, DJSP announced it had signed an agreement to acquire Timios, Inc., a national title insurance and settlement services company.  With regard to this acquisition, Stern said:

> [t]his acquisition significantly expands our capacity to effectively handle national services for our current client base.  In addition it will support our cyclical expansion into other lines of mortgage service business.  In particular, our capacity to process national REO closings, refinance transactions, short-sale transactions, Deed in Lieu transactions, property reports, resale transactions, and multiple valuation products will be meaningfully expanded.

32.     Then, on April 21, 2010, the Company announced that it had been selected to "process files for a national mortgage lender, one of the country's top mortgage servicers, to be one of the primary vendors supporting its national foreclosure alternative program."  In none of

14

these disclosures did Defendants indicate that their revenues or net income would be interrupted or would drop off in the long term.

**DJSP Shocks the Market**

33.     On May 27, 2010, DJSP announced its financial results for the first quarter of 2010.  The Company reported that total revenue for the quarter increased 30.1% to $71.6 million from $55.0 million over the first quarter of the previous year.  However, the Company shocked the market when it unexpectedly adjusted its previous guidance.  Specifically, the Company lowered its guidance for adjusted net income by $15 million to $17 million and for adjusted EBIDTA by $18 million to $22 million.  The new guidance for 2010 was adjusted net income of between $32 and $34 million and adjusted EBIDTA between $58 million and $62 million.  The Company indicated that the lowered guidance was a result of (i) the foreclosure system conversion of one of its largest bank clients, which resulted in a reduction in the referral of foreclosure files; and (ii) a temporary slowdown in foreclosures due to governmental intervention programs.

34.     During the DJSP Q1 FY2010 earnings conference call the following day, May 28, 2010, Defendants attempted to explain this drastic change in guidance.  Stern explained that despite what he and the Company had been publicly stating about the growth of the residential foreclosure market, and invulnerability of the Company's business to governmental efforts to slow the rate of residential mortgage defaults and foreclosures, there was actually a slowdown in referrals over the first quarter of 2010.  Further, in addition to the overall slowdown of residential foreclosures, Stern stated:

> … even more impactful in the short term, one of our largest clients initiated a systems conversion following a recent merger that will impact foreclosure referral volume in the second quarter and may continue into Q3.

\*     \*     \*

**[b]eginning in April, we learned that one of our largest clients initiated a foreclosure system conversion, causing a decrease in foreclosure volume in the month of April and again in the month of May.**  Although this is a temporary reduction, we are unsure if it will continue into the third quarter.

35.     Gursahaney confirmed during the May 28, 2010 conference call that the "reduction in guidance was because of the one client issue. Gursahaney also stated that the reason they did not inform investors and shareholders of the need to reduce guidance earlier was because "we kind of expected that this thing would rectify itself, we would not have any issues …."  In addition, Stern stated that the reduction was caused by the impact of government intervention programs.  Specifically, Stern said:

**To reiterate, this downward adjustment is directly attributed to a reduction in foreclosure case volumes by the impact of governmental intervention and more accurately by the system conversion delays at a major client we serve.**  All indicators point to increase file volumes on the horizon.  However, we cannot determine with certainty when the foreclosure pipeline will begin to resolve itself.  Therefore, we feel it prudent to make the adjustment previously discussed.

36.     One investor, asked Stern the following question during the May 28, 2010 conference call:

I mean, we all have issues in a business that don't go away, but I mean, just last week, you were marketing in New York, talking about the quarter and reiterating to several clients that everything was fine in your business, and I'm very troubled ethically and legally that you would go out on a marketing trip and say such things when clearly, you know, a week later you announce 20% lower numbers.  I mean, is that ethically legal?  Is that, I mean, you're an attorney, do you feel comfortable with your actions?

Incredibly, Stern did not deny that only a week earlier, with full knowledge of the need to revise guidance, that he was in New York saying that everything was fine with the Company's business. Instead, Stern echoed Gursahaney in saying he thought that volume would return.

37.  The market reacted dramatically following the announced reduction in guidance. The adjusted closing price for DJSP shares on May 27, 2010 was $8.87 per share on a volume of 412,500 shares trading. Trading of DJSP shares opened on May 28, 2010 at $6.33 per share and closed at an adjusted price of $6.38 per share on a volume of 4,931,300, representing a drop of nearly 29%. As of April 2, 2010, the Company had 9,166,666 shares outstanding; thus approximately 54% of the Company's outstanding shares were traded following the revelation that there would be a substantial decrease in the number of residential foreclosure cases referred to DJS and subsequently to DJSP.

38.  The statements contained in ¶¶29-32 were materially false, untrue, and/or misleading because (1) Defendants affirmatively represented that the federal government's mortgage intervention programs would have no effect on the number of foreclosures they processed when, in fact, the opposite was true; (2) Defendants affirmatively represented that the federal government's mortgage intervention programs would have no effect on their earnings when, in fact, the opposite was true; (3) the Company announced a business acquisition, touting it as adding significantly to the Company's business prospects, while failing to disclose that the Company was experiencing adverse effects that would materially alter the number of foreclosures the Company processed and/or the Company's net income, including: (i) that the governmental intervention program was having a significant impact on the number of foreclosures the Company processed, and (ii) that one of the Company's largest clients had initiated a foreclosure system conversion, causing a significant decrease in foreclosure volume;

and (4) the Company announced that it had been selected to be one of the primary vendors supporting a national foreclosure alternative program for one of the country's top mortgage servicers, while failing to disclose that the company was experiencing adverse effects that would materially alter the number of foreclosures the Company processed and/or the Company's net income, including: (i) that the governmental intervention program was having a significant impact on the number of foreclosures the Company processed, and (ii) that one of the Company's largest clients had initiated a foreclosure system conversion, causing a significant decrease in foreclosure volume.

## CLASS ACTION ALLEGATIONS

39.      Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased DJSP's securities between March 16, 2010 and May 27, 2010, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.      The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DJSP's securities were actively traded on the National Association of Securities Dealers Automated Quotations Market ("NASDAQ").  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of DJSP shares were traded publicly during the Class Period on the NASDAQ and the Company has over 9 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from records

maintained by DJSP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of DJSP; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of DJSP's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about the Company, its operations, and prospects as alleged herein.

46.    At all relevant times, the material misrepresentations and/or omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about DJSP's business, financial well-being, and prospects and about the government intervention programs.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

47.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

48.     During the Class Period, Plaintiffs and the Class purchased DJSP's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

49.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding DJSP, his/her control over, and/or receipt and/or modification of DJSP's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DJSP, participated in the fraudulent scheme alleged herein.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

50.     The market for DJSP's securities was open, developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, DJSP's securities traded at artificially inflated prices during the Class Period.  On March 16,

2010, the Company's common stock closed at a Class Period high of $11.79 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of DJSP's securities and market information relating to DJSP, and have been damaged thereby.

51.     During the Class Period, the artificial inflation of DJSP's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, which in turn caused the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about DJSP's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of DJSP and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

52.     At all relevant times, the market for DJSP's securities was an efficient market for the following reasons, among others:

(a)     DJSP stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, DJSP filed periodic public reports with the SEC and the NASDAQ;

(c)     DJSP regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        (d)     DJSP was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

53.    As a result of the foregoing, the market for DJSP's securities promptly digested current information regarding DJSP from all publicly available sources and reflected such information in DJSP's stock price.  Under these circumstances, all purchasers of DJSP's securities during the Class Period suffered similar injury through their purchase of DJSP's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

54.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DJSP who knew that the statement was false when made.

## FIRST CLAIM
**Violation of Section 10(b) of The Exchange Act and
Rule 10b-5(b) Promulgated Thereunder Against All Defendants**

55.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, Defendants, individually and in concert, directly and/or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

57.     Defendants' misrepresentations and omissions operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DJSP's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants' misrepresentations and omissions caused Plaintiffs and other members of the Class to purchase DJSP's securities at artificially inflated prices.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants made misrepresentations and/or omissions of material fact during the Class Period, (ii) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of

the Company's management team or had control thereof; (iii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iv) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (v) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

59.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DJSP's true business results and/or prospects from the investing public, and supporting the artificially inflated price of its securities.  If Defendants did not have actual knowledge of the misrepresentations and/or omissions alleged, they were at the very least reckless in failing to obtain such knowledge by, *inter alia*, deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.     As a result of the dissemination of the information set forth above that was either materially false and/or misleading by virtue of Defendants' misrepresentations and/or omissions, the market price of DJSP's securities was artificially inflated during the Class Period.

61.     In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired DJSP's securities during the Class Period at artificially high prices and were damaged thereby.

62.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that DJSP was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their DJSP securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

63.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

65.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of DJSP within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their (i) high-level positions, (ii) ownership and contractual rights, (iii) participation in and/or awareness of the Company's operations, and/or (iv) intimate knowledge of the false financial statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

68.     As set forth above, DJSP and the Individual Defendants each violated Section 10(b) and Rule 10b-5(b) by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(A)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(B)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(D)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:  July 20, 2010

|  | */s/ Joseph E. White III* |
|---|---|
|  | Joseph E. White III (Florida Bar #0621064) |
|  | /s/ Lester R. Hooker |
|  | Lester R. Hooker (Florida Bar #0032242) |
|  | SAXENA WHITE P.A. |
| OF COUNSEL: | 2424 N. Federal Highway, Suite 257 |
|  | Boca Raton, FL  33431 |
| STRAUSS & TROY | Telephone:  (561) 394-3399 |
| Richard S. Wayne | Facsimile:  (561) 394-3382 |
| Thomas P. Glass | E-mail: *jwhite@saxenawhite.com* |
| John M. Levy | E-mail: *lhooker@saxenawhite.com* |
| 150 East Fourth Street |  |
| Cincinnati, OH  45202-4018 |  |
| Telephone: (513) 621-2120 |  |
| Facsimile:  (513) 629-9426 |  |
| E-mail: *rswayne@strausstroy.com* |  |
| E-mail: *tpglass@strausstroy.com* |  |

STATMAN HARRIS & EYRICH
Jeffrey P. Harris
Melinda S. Nenning
3700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202
Telephone: (513) 621-2666
Facsimile:  (513) 621-4896
E-mail: *jharris@statmanharris.com*
E-mail: *mnenning@statmanharris.com*

2263015_1.DOC

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 20, 2010, I electronically filed the foregoing with the Clerk of Court

using the CM/ECF system, which will send a notice of electronic filing to all registered users.


    */s/ Joseph E. White, III*
Joseph E. White, III