**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| PHILADELPHIA FINANCIAL MANAGEMENT OF SAN FRANCISCO, LLC,  BLUE LION MASTER FUND, L.P., STAN COOPER, NEERAJ METHI and GARY CURSON, DPM, Individually and On Behalf of All Others Similarly Situated<br><br>Plaintiff,<br><br>v.<br><br>DJSP ENTERPRISES, INC., DAVID J. STERN, and KUMAR GURSAHANEY,<br><br>Defendants. | Case No. 0:10-cv-61261-WJZ |

**CONSOLIDATED AMENDED COMPLAINT**

Lead Plaintiff Philadelphia Financial Management of San Francisco, LLC ("PFM"), and its co-plaintiffs, on behalf of themselves and all others similarly situated, by their undersigned counsel, allege the following based upon the investigation of counsel, except as to the allegations specifically pertaining to its own acts, which are based upon personal knowledge.  The investigation of counsel included, among other things, a review of the public filings of DJSP Enterprises, Inc. ("DJSP," "Chardan," or "the Company") with the United States Securities and Exchange Commission ("SEC"), press releases issued by the DJSP and its affiliates, media and news reports about DJSP and its affiliates, testimony taken in connection with a pending investigation by the Florida Attorney General, court records and testimony in other proceedings involving the Company, its principals and its affiliates, and publicly available trading data for DJSP's securities.

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the subject matter of this action pursuant

to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

2.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). DJSP's principal executive offices are located in this District, all Defendants transacted business in this District, and most of the acts and transactions constituting the violations of law alleged herein, including the preparation, issuance and dissemination of materially false and misleading statements to the investing public, occurred in this District.

3.      In connection with the acts, conduct and other wrongs alleged herein, each of the Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and national securities markets.

## THE PARTIES

4.      PFM is an investment management firm that, in its capacity as general partner of two hedge funds, purchased DJSP stock. PFM also brings claims in its capacity as assignee of a third hedge fund, Boathouse Offshore, Ltd. Collectively, the three funds made net purchases of $6.2 million of DJSP common stock during the Class Period (as hereinafter defined) and have been damaged thereby. *See* Certification attached hereto as Exhibit A. *See also* Declaration of Rach[a]el Clarke, filed Oct. 7, 2010, Docket No. 16 and Declaration of Mathew E. Miller [filed Oct. 7, 2010], Docket No. 15, both incorporated herein by reference.

5.      Plaintiff Blue Lion Master Fund, L.P. ("Blue Lion") is a Cayman Island limited partnership. Blue Lion purchased DJSP stock and warrants during the Class Period as set forth in the certification attached hereto as Exhibit B and has been damaged

thereby.

6.      Plaintiff Stan Cooper, as set forth in the certification attached hereto as Exhibit C, purchased DJSP's securities at an artificially inflated price during the Class Period and has been damaged thereby.

7.      Plaintiff Neeraj Methi, as set forth in the certification attached hereto as Exhibit D, purchased DJSP's securities at an artificially inflated price during the Class Period and has been damaged thereby.

8.      Plaintiff Gary Curson purchased DJSP stock and warrants during the Class Period as set forth in the certification attached hereto as Exhibit E and has been damaged thereby.

9.      Defendant DJSP is a British Virgin Islands company with its principal place of business in Plantation, Florida.

10.      Defendant David J. Stern was the founder and architect of the underlying business operated by DJSP during the Class Period (as hereinafter defined), and the sole owner of the Law Offices of David J. Stern, P.A. ("DJS"), which was DJSP's sole client during the Class Period.  Stern was the President of the Company from its January 15, 2010 reorganization until July 12, 2010, and again from October 19, 2010 to November 19, 2010.  Stern was the Chairman of the Board of the Company from its January 15, 2010 reorganization until October 19, 2010.  Stern was CEO of the Company from its January 15, 2010 reorganization until November 19, 2010.

11.      Defendant Kumar Gursahaney was the Chief Financial Officer of the Company from its January 15, 2010 reorganization until October 19, 2010.  Defendants Stern and Gursahaney are hereinafter referred to as the "Individual Defendants."

12.      Because of the Individual Defendants' positions within the Company, they each had access to adverse undisclosed material information about its true financial condition and its failure, and the failure of the affiliated law firm, to comply with applicable rules and regulations governing mortgage foreclosures and the practice of law.

They each were privy to such undisclosed information from internal corporate documents, communications among themselves and with other officers and employees of the Company as well as attendance at, and documents received during, meetings of management, and the Board of Directors. Each of the Individual Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading. Despite personal knowledge of the fundamentally deteriorated condition of DJSP throughout the Class Period (as hereinafter defined), and the haphazard and often illegal way in which DJSP and the affiliated law firm went about the business of effecting foreclosure proceedings, each Individual Defendant was motivated to conceal such circumstances from the investing public while they concurrently were seeking an infusion of critically-needed capital.

13.     Because of their positions, their ability to exercise actual operational control, power and influence with respect to DJSP's course of conduct, including the fraudulent schemes and acts described herein, and their access to material inside information about DJSP and the affiliated law firm, the Individual Defendants were, at the time of the wrongs alleged herein, controlling persons of DJSP within the meaning of Section 20(a) of the Exchange Act.

## CLASS ACTION ALLEGATIONS

14.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired DJSP securities during the period from February 16, 2010 through November 15, 2010, inclusive (the "Class Period") and were damaged thereby ("the Class").  Excluded from the Class are the Defendants herein, officers and directors of DSJP, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, they believe there are, at a minimum, more than 500 members of the Class. DJSP common stock traded in an open and efficient market prior to the end of the Class Period. Millions of DJSP shares were traded publicly during the Class Period on the NASDAQ and the Company has over 9 million shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by DJSP or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The following are questions of law and fact common to the Class:

- whether the Individual Defendants engaged in acts or conduct in violation of federal securities laws as alleged herein;

- whether the Individual Defendants made intentional and/or reckless misrepresentations and/or omissions of material facts regarding DJSP to the investing public;

- whether such misrepresentations and/or omissions of material facts were essentially linked to the damages sustained by the Plaintiffs and the members of the Class;

- whether the Defendants acted knowingly or with deliberate recklessness in making false and misleading statements, in issuing false and misleading financial statements, news releases and other communications to the investing public about the financial and operating condition of DJSP, and in failing to disclose material facts concerning DJSP's illegal and fraudulent foreclosure practices;

- whether the prices of DJSP securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained foreseeable damages and, if so, the proper measure of such damages.

17.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the other members of the Class sustained damages arising out of the Defendants' wrongful conduct, in violation of federal law.

18.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

19.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all the members of the Class is impracticable.  Furthermore, because the damages suffered by most of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.    During the Class Period, the Defendants caused to be issued a series of false and misleading statements, and omitted material facts that were required to be disclosed, regarding the true operating and financial condition of DJSP and the manner in which DJSP and the affiliated law firm effected foreclosure proceedings, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

### The Stern Foreclosure Mill

21.    Stern is an attorney licensed to practice by the State of Florida.  After graduating from law school in the 1980s, he worked with Shapiro & Diaz, one of the first

firms to automate the foreclosure process.  In 1993, he formed his own practice, DJS, initially in North Miami Beach, and later in Plantation.  Since that time, DJS has specialized in the representation of mortgage holders in foreclosure proceedings.  In many cases, DJS has represented Fannie Mae and Freddie Mac, the largest holders of mortgages in the United States.

22.     By 1997, when Fannie Mae and Freddie Mac initiated their most-favored-attorney program in Florida, Stern had made the list. Andy Kroll, "Fannie and Freddie's Foreclosure Barons," MOTHER JONES, August 4, 2010.  In 1998 and 1999, Fannie Mae named him "Attorney of the Year." *Id.*  Until very recently, DJS remained Fannie Mae and Freddie Mac's preferred foreclosure counsel in Florida.

23.     In October 1998, Tallahassee attorney Claude Walker filed a class-action lawsuit involving tens of thousands of claimants, alleging that Stern had piled excessive fees on families fighting to keep their homes. Walker, who visited Stern's offices in 1999 to collect depositions, described the place as "a big warehouse" where hordes of attorneys holed up in tiny, crowded offices "like hamsters in a cage." *Id.*  After several years of battling in court, Stern settled for $2.2 million. *Id.*  Based on the transactions involved in that case, the Florida Supreme Court and Florida Bar later reprimanded him for ""professional misconduct" arising from Stern's billing for alleged title insurance services that were actually performed by his staff.   *The Florida Bar v. David J. Stern*, No. SC02-1991 (Fla. Oct. 24, 2002).

24.     In addition to operating the law practice, Stern also operated certain affiliated business that performed non-legal services ancillary to the legal services provided by DJS.  These included the entities formerly known as Professional Title and Abstract Company of Florida, Inc. ("PTA"), a title services company formed in 1994, and Default Servicing, Inc. ("DSI"), formed in 2003, which provided Real Estate Owned liquidation services.

25.     Between 2006 and 2009, the business of DJS and its affiliates increased

geometrically.  From 2006 to 2008, as the number of Americans losing their homes doubled, Stern's case referrals nearly quintupled, and lenders sent him 12 times as many repossessed properties to sell off. "Fannie and Freddie's Foreclosure Barons," *supra*. Gross revenues just for Stern's administrative operations— titles, home sales, and default processing— leaped from $40 million to $200 million.  *Id*.

26.      Stern's payroll increased from approximately 225 employees in early 2008 to approximately 1,100 employees by July 2009.  Deposition of Tammie Lou Kapusta, *In re: Investigation of Law Offices of David J. Stern, P.A.* AG # L10-3-1145 (Sept. 22, 2010) ("Kapusta Dep."). Orientations for new hires were a near-weekly affair, said a former secretary. "Fannie and Freddie's Foreclosure Barons," *supra*.  The firm had grown so fast, it was simply impossible to maintain any measure of quality control with respect to the firm's internal processes, nor with respect to the retention and training of its personnel.

27.      Numerous former employees have indicated that Stern has run the legal equivalent of a "sweat shop," in which lawyers and other employees are required to churn out foreclosure papers at breakneck speed without particular concern as to their accuracy or legality.  The law firm and related businesses were run like industrial assembly lines. Attorneys would prepare for dozens, and at times hundreds, of court hearings in rapid succession.  To state merely that some corners were cut would vastly understate the scope of the problem.  DJS systematically commits fraud and criminal acts in the prosecution and administration of foreclosure actions.

28.      One attorney Stern brought on in 2007, fresh from law school, told a reporter she was ordered to sign legal filings that were dumped on her desk before she had a chance to read them. "Fannie and Freddie's Foreclosure Barons," *supra*. She eventually quit. "Ethics are thrown out the door," she said. Another lawyer who deals with the firm regularly stated that Stern's seasoned employees belittled the newbies, referring to them simply as "bar licenses." *Id*.  Many of the (predominantly young and

inexperienced) staff attorneys were uncomfortable with the procedures followed by the firm, but were reluctant to speak up for fear of losing their jobs.  Kapusta Dep., *supra*.

29.    Supervisors said that paralegals would be fired if they didn't complete at least 15 daily "casesums"— information summaries for new cases referred to the firm. Kapusta Dep., *supra*.

30.    Another paralegal who spent three years at Stern's firm said there were unofficial contests to see who could jam a case through the fastest. "Fannie and Freddie's Foreclosure Barons," *supra*.  "Somebody would get a 76-day foreclosure," she said, "and then someone else would say, 'Oh, I can beat that!'" An uncontested foreclosure in Florida typically lasts 135 days [according to industry analyst RealtyTrac.  *Id*.

31.    From 2005 through 2007, city inspectors repeatedly cited the firm for code violations such as blocking exits and fire sprinklers with storage at its overcrowded offices, and for creating a hazard by stringing extension cords between departments. *Id*.

32.    In some courts, DJS attorneys would employ what was referred to internally as a "rapid docket," in which as many as 500 hearings, of approximately five minutes' duration, would take place in a single day.  Deposition of Kelly Scott, *In re: Investigation of Law Offices of David J. Stern, P.A.* AG # L10-3-1145 (Oct. 4, 2010) ("Scott Dep."); Kapusta Dep., *supra*.  The firm "would push out as many files as we can and get all the pleadings entered and granted."  Scott Dep., *supra*.

33.    Notaries at the Company routinely notarized legal instruments outside of the presence of the signors, and often months, if not years later.  Kapusta Dep., *supra*. Scott Dep., *supra*.

34.    The name of Cheryl Samons, in particular, was executed on hundreds of mortgage assignments, affidavits of indebtedness, and other instruments per day. Ms. Samons was, at all pertinent times, the senior nonlawyer manager, with the title of Manager of the Foreclosure Department until 2008 when her title was changed to Chief Operating Officer.   Ms. Samons   would   routinely   execute   supposedly   notarized

instruments outside of the presence of notaries, and after they had already been "notarized." Scott Dep., *supra*; Kapusta Dep., *supra*. Hundreds of documents would simply be laid out on a long table for her to sign – she would sign them without reading them, and without the contemporaneous notarization or witnessing of her signature. The instruments would also be "witnessed" by persons who were not present during the signings. Kapusta Dep., *supra*. To make matters worse, several paralegals were authorized, and trained, to sign documents for Ms. Samons, and did so regularly. Scott Dep., *supra*; Kapusta Dep., *supra*. Notary stamps, moreover, were literally passed around and used indiscriminately by the paralegals. Kapusta Dep., *supra* ("As far as notaries go in the firm I don't think any notary actually used their own notary stamp. The team used them.").

35.     A Florida notary's stamp is valid for four years, and its expiration date is visible on the imprint. Tom Ice, Esq., a foreclosure defense lawyer, discovered "dozens of assignments notarized with stamps that hadn't even existed until months— in some cases nearly a year— after the foreclosures were filed. "Fannie and Freddie's Foreclosure Barons," *supra*. This proved that Stern's people were foreclosing first and doing their legal paperwork later. In effect, it also meant they were lying to the court. "There's no question that it's pervasive," said Ice of the backdated documents – 'We've found tons of them.'" *Id*.

36.     In March 2010, in the proceeding styled *U.S. Bank National Association, as Trustee, et al v. Harpster,* NO. Sl-2007-CA-6684ES (Fla. 6th Cir. Ct. Pasco Co.), a state circuit court judge dismissed a foreclosure proceeding *with* prejudice because DJS had filed fraudulent foreclosure papers, including a mortgage assignment on which a notary had backdated the notarization (to a date that preceded the issuance of the notary's commission).

37.     Beyond the backdated notarizations, employees have reported numerous other irregularities

38.     When instruments were required to be executed by representatives of the mortgage holders, the Company would frequently copy the signature page of an instrument pertaining to one property and simply append it to an instrument pertaining to a different property.  *Id*.

39.     Case chronologies— the timeline of important events in a foreclosure— were changed "all day long" to create the appearance of propriety, noted a former Stern paralegal. "Fannie and Freddie's Foreclosure Barons," *supra*.

40.     The Company's document handling and processing practices were sloppy, and original mortgage notes were frequently lost, as the Company's process of managing such instruments was in "disarray."  Kapusta Dep., s*upra.* As explained by Ms. Kapusta, "there were a lot of young kids working up there who really didn't pay attention to what they were doing. We had a lot of people that were hired in the firm that were just hired as warm bodies to do work."  *Id*.

41.     When notes were lost, Ms. Samons (or someone signing for her) would then execute an allegedly notarized "lost note" affidavit (as with other instruments, outside the actual presence of the notary).  *Id*.

42.     Attorneys would sign affidavits of attorney fees with no fee amounts filled in.  These would later be filled in by paralegals.  Kapusta Dep., *supra*.

43.     The Company engaged in the particularly insidious practice of false military searches.  Certain judges would require that searches be performed to determine whether any missing property owners, or other persons to be served, were in military service.  When the Company did not have the social security number of the person to be served, it simply plugged in the social security number of another person.  This was done at the express direction of senior attorneys Miriam Mindieta, Esq. and Beverly McComas, Esq.  Kapusta Dep., *supra*.  Ms. Kapusta was fired for refusing to engage in this practice.  *Id*.

44.     The Company would attempt to cover up its many problems with its case files during periodic audits from Fannie Mae and Freddie Mac.  Scott Dep., *supra*.  Client codes on the files would be (temporarily) changed from Fannie and Freddie to other clients, and files would be hidden from auditors if there were problems with them. When Fannie and Freddie auditors left, the cases would be changed back.  *Id*.

45.     Supervisors would instruct their staffs to ignore or hang up on homeowners who called in with complaints.  Kapusta Dep., *supra*; "Fannie and Freddie's Foreclosure Barons," *supra*.  The rule applied even if the homeowner called with a legitimate issue. "You would get calls from people saying, 'We are going to be evicted today, and I just got out of the hospital. I just had a baby,'" a secretary told me. "I'd go into my boss' office, and she'd say, 'That's their problem.'"  An employee from Stern's reinstatement unit— which is supposed to help borrowers get out of default— also spoke of a culture of indifference: "'"I've had people call and tell me the locks were changed because their house had been sold at auction'" without them knowing, she said. "'But you would get in trouble if you were on the phone for a long time with the borrower.'"" "Fannie and Freddie's Foreclosure Barons," *supra*.

46.     The Company routinely gouges homeowners with excessive junk fees, even where those homeowners are willing to become current with their mortgages.  As alleged in the action styled *Rory Hewitt v. Law Offices of David J. Stern, P.A., et al*., No. 2009-036046 (Fla. 15th Cir. Ct. Palm Beach Co.), the Company attempted to tack on thousands of dollars in fees and mortgage payments to the amounts due from plaintiff Rory Hewitt.  Hewitt's bill was larded with charges— property inspection, title, and late fees that seemed exorbitant even in an industry renowned for arbitrary fees, plus monthly loan payments that weren't yet due, and fees for service of process on persons who did not even exist.  Hewitt has brought a class action on behalf of himself and others similarly situated.

47.     The Company's excessive billing practices are particularly blatant with respect to service of process fees.  Except in those few jurisdictions in which judges have stopped the practice, the Company routinely bills for service of process upon multiple persons, even when the property has only one owner.  Scott Dep., *supra*; Kapusta Dep., *supra*; Deposition of Mary R. Cordova*, In re:  Investigation of Law Offices of David J. Stern, P.A.* AG # L10-3-1145 (Sept. 23, 2010).   When the property is owned by two spouses, the Company also bills for each of the *spouse's* spouses, or a total of four persons allegedly served.  Kapusta Dep. ("bills always consisted of the defendant, an unknown spouse of the defendant if there wasn't a spouse, and always a Jane and John Doe").  It would not be unusual for the Company to bill for service on as many as ten persons in a single case.  The Company has close relationships with its two preferred process firms – Gissen & Zawyer and ProVest.  ProVest, in fact, occupies substantial office space at the Company's headquarters.  Scott Dep., *supra*; Kapusta Dep., *supra*. These excessive process fees are tacked onto the charges assessed against allegedly delinquent homeowners, and, if they cannot pay them, are ultimately paid by the banks or other institutions holding the mortgages.

48.     What makes matters worse is that the Company bills for excessive service fees regardless of whether it actually effects service.  Notwithstanding the fact that affidavits of service are filed, a paralegal estimates that there are serious problems with service in approximately 50% of cases.  Kapusta Dep., *supra*.  This is the principal source of complaints from homeowners who are defendants in proceedings initiated by the Company.  *Id*.

49.     The foregoing practices implemented by Ms. Samons were implemented at the express direction of Defendant Stern.  As noted by Ms. Kapusta:

A     Because Cheryl and David had daily meetings. David knew the practice that was going on. David's office happened to be right outside -- I sat right in front of David's office. I'm well aware of what transpired. Cheryl's office was here. Around the corner was David's office. Everything was in the loop. He was

well aware of what was going on. I mean, you could hear the screaming conversations. Nothing was really a secret on the fourth floor

Kapusta Dep., *supra*.  Ms. Samos was handsomely rewarded for her loyalty to Mr. Stern, receiving a new BMW SUV from Stern every year, and also having her personal bills paid by the Company.   Kapusta Dep., *supra*; Scott Dep., *supra*. The two were also social acquaintances, and even vacationed together.  Kapusta Dep., *supra*.

### The Formation of DJSP and Its Acquisition of the Stern Back Office Operations

50.    DJSP was incorporated in the British Virgin Islands on February 19, 2008 under the name "Chardan 2008 China Acquisition Corp." as a "blank check company" or "special purpose acquisition company" ("SPAC").  A SPAC is a collective investment scheme that allows public stock market investors to invest in private equity type transactions, particularly leveraged buyouts. SPACs are shell or blank-check companies that have no operations but go public with the intention of merging with or acquiring a company with the proceeds of the SPAC's public offering or private placement.

51.    According to DJSP's SEC filings, the stated purpose of its formation, initially, was "acquiring, engaging in a merger or share exchange with, purchasing all or substantially all of the assets of, or engaging in a contractual control arrangement or any other similar business combination with an unidentified operating business which has its principal business and/or material operations in China."

52.    In 2008, Chardan issued 11,166,666 warrants exercisable at $5.00 each for one share of Common Stock, expiring on August 11, 2012 (the "Chardan Warrants"). This includes 6,875,000 of these warrants (the "Public Warrants"), issued as part of the Company's Initial Public Offering, that are redeemable by the Company at a price of $0.01 per warrant and upon thirty (30) days' notice if the closing price of DJSP's shares equals or exceeds $10 for 20 out of 30 consecutive trading days, but only if the shares underlying these 6,875,000 warrants have been registered pursuant to a registration statement declared effective by the SEC. In the event that the Public Warrants are

redeemed, all or nearly all of them would be likely to be exercised since the market price will likely substantially exceed the exercise price, and those warrant holders who do not exercise them would receive only $0.01 per warrant.

53. On December 10, 2009, Chardan entered into a Master Acquisition Agreement ("Acquisition Agreement") pursuant to which it would, in substance, acquire a majority ownership interest in (1) PTA, (2) DSI, and (3) the "non-legal processing portion of [the] operations" of DJS (the "Transaction").

54. The Transaction was structured in two steps.

55. First, the assets of PTA, DSI and the "non-legal processing" operations of DJS would be transferred to three newly formed Delaware LLCs - DJS Processing, LLC, ("DJS LLC"), Professional Title and Abstract Company of Florida, LLC, ("PTA LLC"), and Default Servicing, LLC ("DSI LLC"). These three LLCs would be subsidiaries of DAL Group, LLC ("DAL"), also a Delaware LLC.

56. Contemporaneously with the consummation of the Transaction, DJS and DJS LLC entered into a long-term Services Agreement, pursuant to which DJS engaged DJS LLC to provide substantially all non-legal support required for the legal matters handled by DJS.  These were services that were previously performed within DJS. Although DJSP would be a separate corporation as a matter of form, it would remain inextricably linked to DJS.  To put it simply, DJS was its only client, and DJSP would succeed or fail only to the extent that DJS would bring it business.

57. Second, Chardan would acquire a majority ownership (approximately 75-80% ownership, depending on whether existing DAL equity owners exercised certain redemption rights to acquire interests in the entity following the transaction).  The remaining equity (20-25%) in DAL would be retained principally by Stern (possibly with others who may have owned equity in DJS, PTA or DSI).

58. For the DAL membership interests it was acquiring, Chardan paid DAL approximately $64,500,000 (reduced by an amount equal to the funds paid to Chardan

shareholders who exercised redemption rights or dissenters' rights).

59.     The consideration paid to the "Stern Contributors" (Stern and any other DAL equity holders) from DAL would consist of three principal elements.  First, the Stern Contributors would receive an initial cash payment of approximately $58,500,000. Second, DAL would execute a note in favor of the Stern Contributors in the principal amount of approximately $52,469,000.  Third, the Stern Contributors would receive an additional payment of $35,000,000 (referred to in DJSP's SEC filings as "Post-Closing Cash") after payment in full of the Stern Note.  In substance, Stern was selling a 75-80% interest in his non-legal-services businesses to the prior Chardan shareholders for $145 million -- with $52.4 million paid up front, but with the bulk of the price, approximately $92.6 million, deferred.

60.     As part of the Transaction, DJSP received a warrant to purchase 11,441,666 DAL Common Units, which must be exercised in the event that the corresponding Chardan Warrants and options are exercised (the "DAL Warrants").  In effect, whatever funds were received by DJSP from the exercise of the Chardan Warrants would simply pass through to DAL through DJSP's exercise of the DAL Warrants.

61.     Most importantly, it is critical to understand that the proceeds from the exercise of the Chardan Warrants (and, in turn the DAL Warrants) would then pass directly to the Stern Contributors.

62.     The funds to pay the "Stern Note" and "Post-Closing Cash" would come from two principal sources.  First, the Stern Note is secured by all assets of DAL, and "90% of [DAL's] free positive cash flow" is required to be allocated to repayment of the Stern Note.  Second, the Acquisition Agreement provides that "[a]ll proceeds from the exercise of the DAL Warrants must be used to pay the principal of the Stern Deferral Note on a priority basis," with the remainder going to pay the "Post-Closing Cash."  The Company also, "[i]n order to accelerate the payment of the receiving cash owed to the Stern Contributors…agreed to call [its] warrants as soon as the conditions for doing so

16

are met." Registration Statement on Form F-1, filed with the SEC on or about February 16, 2010. If the proceeds from the exercise of the DAL Warrants would be insufficient to pay the "Post-Closing Cash," the Stern Contributors would be entitled to be paid 90% of DAL's free positive cash flow until the payment was complete, and would also be entitled to certain periodic penalties as long as the obligation remained outstanding.

### The Big Sell – Stern's Race to Keep the Stock Above $10 and Obtain SEC Approval of a Registration Statement

63.     The Transaction was consummated on January 15, 2010, at which time the Company was renamed "DJSP Enterprises, Inc." and obtained ownership of its majority interest in DAL. In substance, this was the point in time that those elements of DJS and its affiliates (other than the law firm, *per se*) became a public company.

64.     Stern had an enormous incentive to cause the stock price to rise, and remain, above $10 per share – as it could enable the Company to redeem the Public Warrants (and, in turn, a majority of the DAL Warrants) in the short term. It would also provide an incentive to warrant holders, including those of the warrants that were not subject to redemption by the Company, to voluntarily exercise their warrants.

65.     First, as is obvious from the letter of the acquisition instruments, Stern would be the principal beneficiary of the warrants being redeemed, or otherwise executed, as it would accelerate the payment of the Stern Note and Post-Closing Cash.

66.     Second, if the warrants were not exercised or redeemed in the near future, it would pose a substantial risk to Stern that he would never be paid in full. By entering the Acquisition Agreement in late 2009, Stern was positioning himself to cash out at the peak of the mortgage foreclosure boom. DJS and is affiliates had grown exponentially over the prior three years, and it could hardly be assured that it would continue to prosper as it had previously. An improved economy, or, more immediately, federal legislation designed to help troubled homeowners avoid foreclosure, presented possible near term threats. These were serious potential threats to Stern's receipt of the deferred

compensation elements of the Acquisition Agreement.

67. Stern needed to do two things to enable the Public Warrants to be redeemed.

68. First, he had to cause the Company's stock price to equal or exceed $10 for 20 out of 30 consecutive trading days. Notably, the price of the Company's stock had never previously risen above $10 per share, even after the Transaction was publicly announced in December 2009.

69. Second, he had to obtain SEC approval of a Registration Statement pursuant to which common stock issued upon redemption or exercise of the Chardan Warrants could be publicly traded. Between February and June 2010, Stern and DJSP would feverishly pursue both objectives.

70. On February 16, 2010, DJSP filed with the SEC the first iteration of a Registration Statement on Form F-1.

71. In that iteration of the Registration Statement, as in all subsequent iterations, Defendants portrayed the Company as one that employed rigorous processes and controls to ensure accurate and efficient prosecution of foreclosures. At the same time, they concealed the reality that the Company had obtained its profitability by cutting corners (by underpaying and overworking its employees in a sweatshop environment, and engaging in slipshod and often illegal procedures) and that its processes were, in fact, entirely chaotic and in substantial disarray.

72. In the Registration Statement, the Defendants made the following representations concerning the alleged "rigorous" processes employed by the Company to obtain the "accuracy" and "efficiency" demanded by DJS' clients:

> DAL relies heavily on a proprietary case management software system, which stores, manages and reports on the large amount of data associated with each foreclosure, bankruptcy, REO liquidation or eviction case file we process, to **achieve a high level of efficiency, accuracy and customer service.**

\*\*\*

Through extensive investment in its leading-edge IT, development of scalable proprietary processes as a centralized facility, **and hiring and training of the staff needed to conduct operations at a large scale**, we are well positioned to maintain a competitive advantage in an industry generally populated by smaller firms.

\*\*\*

Our IT systems allow us to interact efficiently with clients and reduce processing time while **minimizing human error** in handling approximately 5,000 new files that we currently receive[] for processing on average in a month.

\*\*\*

A key factor in this success is the ongoing implementation of leading edge IT solutions that optimize interface and data transfer activities with clients and improve processing time while reducing human error. We also **deliver effective staff training** to ensure the efficient and effective processing of all referrals.

\*\*\*

Clients demand high levels of service from the firms handling the mortgage foreclosure process, **with a particular emphasis on the process rigor, efficiency and accuracy with which the firms complete the foreclosure process**. All the major lenders have a well defined process for foreclosure filings, and they expect their law firm vendors to conform to the bank foreclosure process in order to monitor progress and minimize losses throughout the process. This process efficiency is critical, as faster foreclosures mean fewer missed payments by borrowers and fewer delinquency payments made by loan servicers to investors on behalf of delinquent borrowers. **Accuracy is also critical,** as any resubmission of paperwork or additional court hearings extend the foreclosure process and impose additional cost. Reputation of the law firm and tenure of the partner are also additional client considerations.

**We have [] developed rigorous processes** tailored to the needs of each of DJS' clients as a result of having processed a significant percentage of their case volume over many years of service. We have also invested in proprietary technology over the years to achieve high efficiency and minimal foreclosure processing time. We believe that, in combination with the increasing case volumes, rising client expectations, and high barriers to entry with respect to the substantial minimum technological requirements to achieve efficiency, **we are uniquely positioned to capitalize on opportunities for further growth in its current and future markets**.  (emphasis added)

The foregoing statements were also contained in subsequent iterations of the Registration

Statement filed with the SEC on March 26, 2010, April 22, 2010, May 19, 2010, June 4, 2010, and June 18, 2010,  as well as other filings with the SEC, including but not necessarily limited to a report on Form 20-F filed on April 2, 2010.

.73.    In a March 26, 2010 version of the Registration Statement filed on Form F-1/A, the Defendants further represented that "DJS has made significant investments in technology, processes, and staff in order to meet the requirements for foreclosure actions throughout Florida."  This language was also contained in iterations of the Registration Statement filed with the SEC on April 22, 2010, May 19, 2010, June 4, 2010, and June 18, 2010, as well as other filings with the SEC, including but not necessarily limited to a report on Form 20-F filed on April 2, 2010.

74.    The foregoing statements were affirmatively false and misleading, and also omitted material adverse information that was required to be disclosed under the circumstances.

75.    The Company and DJS did not "achieve a high level of efficiency, accuracy and customer service," employ "rigorous processes," nor have even the slightest concern about "accuracy," as its internal processes were chaotic and slipshod.  As described in some detail above, legal instruments were notarized and witnessed prior to their execution, original mortgage notes were routinely lost, signatures on legal instruments were forged, signature pages of legal instruments were simply copied and appended to instruments pertaining to other properties, excessive process fees were routinely tacked on regardless of whether anyone was actually served with process, and files were altered and hidden during audits performed by major clients.

76.    The Company did not effect the "hiring and training of the staff needed to conduct operations at a large scale" nor make significant investments in staff.  Many functions were shipped offshore to Guam and the Philippines to cut costs.  The Company's staff were underpaid and overworked, and bullied by management in an exceedingly hostile sweatshop atmosphere.  The predominantly young and inexperienced

attorneys were treated as mere "bar licenses," while the paralegals were treated even worse.

77.     On February 17, 2010, DJSP issued a press release announcing its guidance for 2010. Specifically, the Company stated that it expected to report adjusted net income of approximately $49 million and adjusted EBITDA of approximately $80.6 million, excluding a one-time transaction expense associated with the Transaction.

28.     On March 11, 2010, DJSP announced quarterly revenues increased 33% to $70.5 million from $52.9 million from the first quarter of 2009 and year-to-date ("YTD") revenues increased 31% on revenue of $260.3 million. At that time Stern stated:

> DJSP delivers unparalleled customer service by combining unique mortgage and foreclosure expertise with highly automated electronic processing. This efficiency has historically enabled us to significantly grow both our top and bottom-line results. As a public company we will be able to leverage our expertise, diversify our service offerings, and expand geographically in order to accelerate our growth and enhance our client relationships. Going forward, we are particularly excited about our REO business which will become an increasingly significant source of revenue and income growth in the coming years.

28.     Also at this time, the Company reaffirmed its previously announced guidance for 2010, stating that it expected to report adjusted net income of approximately $49 million and adjusted EBIDTA of approximately $80.6 million, excluding the one-time expense related to the Transaction.

28.     The foregoing statements were affirmatively false and misleading, and also omitted to disclose certain materially adverse information that was required to be disclosed under the circumstances.  The Business has never delivered "unparalleled customer service" and any "efficiency" was achieved at the expense of accuracy, and by engaging in slipshod and often illegal practices.

78.     Between March and May 2010, Defendants staged "roadshows" designed to promote the Company's securities.  Investopedia.com defines "roadshow" as "A presentation by an issuer of securities to potential buyers" that "is intended to create

interest in the securities."  The website further explains that, "also known as a 'dog and pony show,' a road show is when the management of a company issuing securities or doing an IPO travels around the country giving presentations to analysts, fund managers, or potential investors," and that "often, the success of a road show is critical to the success of an offering."

79.     What was remarkable about DJSP's roadshow campaign is that DJSP was *not* conducting an initial, or even secondary, offering of any of its securities.  The purpose of the campaign was to drum up interest in the Company's stock in order to cause the stock price to rise above $10 per share, both to enable the Company to redeem the Public Warrants, and to provide an incentive to all warrant holders to voluntarily exercise their warrants.

80.     On March 16, 2010, Defendants Stern and Gursahaney made a presentation at the 22nd Annual Roth OC Growth Stock Conference held in Dana Point, California.  At the conference, Defendant Stern stated:

> Historical foreclosure growth, foreclosures have experienced sustained growth for over 25 years at an annual rate of approximately 12%, foreclosure volumes are expected by DJSP and by all my comps to continue to grow to historical height. Near term outlook, loans past due the leading indicator for the future foreclosures it continues to increase. **No matter what Obama rolls out, there is no stopping this inflow of continued defaults that we anticipate to go for another two or three years… REO[("Real Estate Owned" by foreclosing mortgage holders)] … need[s] to be liquidated and at the end of the day, the cycle will start again. Well, foreclosure volumes through 2012 are expected to increase dramatically and remain at high levels going on till 2017.**
>
> ***
>
> We currently only represent one client. We expect to increase that in the year 2010 by adding one and only one additional client to achieve that 100% increase and keep in mind, we represent 17 out of the top 20 lenders in the country and we really have not solicited to this day additional REO business because we kept it under an exclusive which is no longer applicable. (emphasis added)

81.  Defendant Stern further said, with respect to the federal government's $75 billion homeowner-relief program, that "[f]ortunately, it is failing."  In fact, he stated that

the Company would profit from opportunities created by programs designed to help homeowners avoid foreclosure. He elaborated:

> **So no matter what the Obama administration brings our way, we have found the way to create a profit center** on it and that I think is part of the success.
>
> ***
>
> **So I don't think we are going to see really any bumps. I think we are going to see all of the operating subsidiaries really jump out especially with what's being pushed through the systems. In my office alone, I have over 15,000 foreclosures that simply need to be set for sale.** When they are set for sale because they are under HAMP [(Home Affordable Modification Program)] review, when they are set for sale not only do I get $250 for resetting each of them but once they are reset if when they are sold, they will go back to the GFE where under my contract I do cradle to grave then I get to do the closing on them, $250 for stock price, plus $250 for closing fee, $400 for title search, title exam, title update and then I get a right to title policy and if there is a lender involved, I get a right to lender's policy. So it all flows nicely, yes sir. (emphasis added)

82.     Also at the Roth Conference, the Defendants made a slide presentation that was also filed with the SEC as an exhibit to a Report on Form F-6 filed on the same date, March 16, 2010. In the slide presentation, the Defendants again touted the Company's alleged "unparalleled customer service." The Defendants further touted the Company's "transition to a paperless system to increase reliability, efficiency and margins." The slide presentation was bullish on the Company's short-term and medium-term prospects, representing that the Company expected gross revenues of $318 million, EBITDA of $80 million, and net income of $49 million for 2010.

83.     The foregoing representations were false and misleading. By March 16, 2010, at which time the first quarter of 2010 was 83% complete, the Defendants knew that foreclosure volumes were slowing in the quarter, and that this was due, at least in part, to the effect of government programs designed to reduce the volume of foreclosures, which Stern would later concede. The known reduction in foreclosure volumes rendered misleading and inaccurate the Defendants' representations concerning the Company's financial performance, including the guidance provided to investors, which should have

been adjusted.

84.     In April 2010, the Defendants learned that one of DJS's largest clients initiated a foreclosure system conversion, causing a decrease in foreclosure volume in the month of April and again in the month of May, and that it might continue into the third quarter of 2010.   Notwithstanding the substantial near-term implications of this conversion, the Defendants did not make any corrective disclosures, nor modify their guidance provided to investors in March 2010.   Such corrective disclosures were necessary in order to render prior representations concerning the Company's performance not false and misleading.

85.     Instead, the Defendants continued to aggressively market the Company to investors.

86.     April 22, 2010, the Defendants held a conference call with securities analysts.  Defendant Gursahaney reaffirmed the Company's prior guidance for 2010 at $318 million in revenues, and EBITDA of $80 million.  Defendant Stern stated that he believed that the Company's guidance was "conservative," and was based on an expected uptick in foreclosures and the addition of another client, but was not based on the expectation of any acquisitions.  Defendant Stern also stated, as he had at the Roth Conference in March, that he was not overly concerned by HAMP, and represented that the Company was well-positioned to adjust to, and even profit from, the procedures implemented by HAMP.  Stern also noted that he had blocked off dates for upcoming roadshows in New York.

87.     In mid-May 2010, the Company conducted additional roadshows in New York and, upon information and belief, Boston.  During the May roadshows, upon information and belief, the Defendants repeated the optimistic representations made at the Roth conference in March, and did not alter their prior guidance for the quarter, nor for the year.

88.     The Defendants were, at least until mid-May 2010, having considerable

success in causing the Company's stock price to rise, and stay, above $10 per share. The price of DJSP stock shot up over $12 in March and April 2010. In fact, the stock price exceeded $10 for the required 20 days in a 30 day period necessary to permit the Company to redeem the Public Warrants.

89.     The Defendants were having considerably less success in obtaining SEC approval of the Company's Registration Statement. In a letter dated March 15, 2010, the SEC demanded several modifications to the Registration Statement, addressed by the Company in a letter and revised Registration Statement filed on March 26, 2010. The SEC demanded further modifications in a letter dated April 16, 2010, that was subsequently addressed by the Company in a letter and revised Registration Statement filed on April 22, 2010. The SEC demanded further modifications in a letter dated May 14, 2010, addressed by the Company in a letter and revised Registration Statement filed on May 18, 2010.

**The Company Shocks the Market, and Contradicts the Guidance Provided in its Recent Roadshow Campaign, With a Downward Revision in Its Projections for 2010**

90.     As of May 27, 2010, the SEC had not yet responded to the Company's submission of May 18, 2010. Moreover, on or about May 20, 2010, the Company's stock price had declined below $10 per share, and it had remained below that threshold as of May 27, 2010. While, at least in theory, the recent performance of DJSP stock would have made it possible for the Company to redeem the Public Warrants at any time through June 7, 2010, redemption was impossible due to the fact that the Registration Statement had not been declared effective by the SEC. In light of the practical impossibility of redeeming the Public Warrants, the Defendants no longer had a substantial incentive to conceal adverse information concerning the Company's near-term business prospects.

91.     On May 27, 2010, just one week after reaffirming its earlier guidance at the Boston and New York roadshows, DJSP announced its financial results for the first

25

quarter of 2010. The Company reported that total revenue for the quarter increased 30.1% to $71.6 million from $55.0 million over the first quarter of the previous year.  This increase was primarily due to expansion in the Company's REO business, however, and not due to its core business of foreclosure processing.  In fact, the Company announced that "during the first quarter of 2010 the pace of new foreclosures slowed."  This trend caused the Company to unexpectedly adjust its previous guidance, which shocked the market. Specifically, the Company lowered its guidance for adjusted net income by $15 million (or 46%) to $17 million and for adjusted EBIDTA by $18 million (or 45%) to $22 million. The new guidance for 2010 was adjusted net income of between $32 and $34 million and adjusted EBIDTA between $58 million and $62 million. The Company indicated that the lowered guidance was a result of (i) the foreclosure system conversion of one of its largest bank clients, which resulted in a reduction in the referral of foreclosure files; and (ii) a temporary slowdown in foreclosures due to governmental intervention programs.

92.     During the DJSP Q1 FY2010 earnings conference call the following day, May 28, 2010, Defendants attempted to explain this drastic change in guidance. Stern explained that despite what he and the Company had been publicly stating about the growth of the residential foreclosure market, and invulnerability of the Company's business to governmental efforts to slow the rate of residential mortgage defaults and foreclosures, there was actually a slowdown in referrals over the first quarter of 2010. Further, in addition to the overall slowdown of residential foreclosures, Stern stated:

> ... even more impactful in the short term, one of our largest clients initiated a systems conversion following a recent merger that will impact foreclosure referral volume in the second quarter and may continue into Q3.
>
> ***
>
> **[b]eginning in April, we learned that one of our largest clients initiated a foreclosure system conversion**, **causing a decrease in foreclosure volume in the month of April and again in the month of May**. Although this is a temporary reduction, we are unsure if it will continue into the third quarter. (emphasis added)

93.     In addition, Stern stated that the reduction was also caused by the impact of government intervention programs. Specifically, Stern said:

> **To reiterate, this downward adjustment is directly attributed to a reduction in foreclosure case volumes by the impact of governmental intervention and more accurately by the system conversion delays at a major client we serve.** All indicators point to increase file volumes on the horizon. However, we cannot determine with certainty when the foreclosure pipeline will begin to resolve itself. Therefore, we feel it prudent to make the adjustment previously discussed. (emphasis added)

94.     During the May 28, 2010 conference call, one analyst astutely pointed out that the Company had abruptly changed its message about its short-term prospects from the message being delivered at the New York roadshow:

> I mean, we all have issues in a business that don't go away, but I mean, just last week, you were marketing in New York, talking about the quarter and reiterating to several clients that everything was fine in your business, and I'm very troubled ethically and legally that you would go out on a marketing trip and say such things when clearly, you know, a week later you announce 20% lower numbers. I mean, is that ethically legal? Is that, I mean, you're an attorney, do you feel comfortable with your actions?

95.     The market reacted dramatically following the announced reduction in guidance. The adjusted closing price for DJSP shares on May 27, 2010 was $8.87 per share on a volume of 412,500 shares trading. Trading of DJSP shares opened on May 28, 2010 at $6.33 per share and closed at an adjusted price of $6.38 per share on a volume of 4,931,300, representing a drop of nearly 29%. As of April 2, 2010, the Company had 9,166,666 shares outstanding; thus approximately 54% of the Company's outstanding shares were traded following the revelation that there would be a substantial decrease in the number of residential foreclosure cases referred to DJS and subsequently to DJSP.

96.     On June 25, the SEC finally declared effective the Registration Statement, and the Company, on that date, issued a Prospectus for shares including those issuable upon exercise of the Chardan Warrants. By this time, however, it was too late for the Company to redeem the Public Warrants, and the stock was trading at approximately

$6.25 per share.  The price of the Company's stock continued to tumble over the next two months.

97.     On July 12, 2010, the Company announced that it had hired a new President and COO, Mr. Richard Powers, formerly the head of Real Estate Services for Altisource Portfolio Solutions, SA.  Defendant Stern would remain CEO and Chairman.

### The Revelation of the Company's Shoddy Documentation and Foreclosure Practices, the Attorney General's Investigation, and the Resulting Collapse of the Company's Business

98.     On August 3, 2010, MOTHER JONES published the aforementioned article entitled "Fannie and Freddie's Foreclosure Barons," a report describing in some detail the Company's reckless, and often illegal, documentation and foreclosure practices.

99.     Approximately one week later, on or about August 11, 2010, Florida Attorney General Bill McCollum announced that he was investigating DJS, along with certain other law firms engaged in the representation of mortgage holders in foreclosure proceedings.  The Attorney General stated that the firms may have presented fabricated documents in court to obtain foreclosure judgments against homeowners, and that thousands of final judgments of foreclosure against Florida homeowners may have been the result of improper actions by the firms under investigation.

100.     Stern's attorney, Jeffrey Tew, stated, "We're convinced that David's law firm has been acting appropriately," and "[w]e don't have any concern about the outcome."  Nirvi Shah, "3 South Florida Foreclosure Law Firms Probed," MIAMI HERALD, August 11, 2010.  Tew brushed off McCollum's announcement by saying that Stern handled 100,000 cases in the last few years, and "a few mistakes were inevitable." Paul Brinkman, "Florida Bar Previously Disciplined Stern," SOUTH FLORIDA BUSINESS JOURNAL, August 20, 2010.

101.     On September 7, 2010, the Company announced its results for the quarter and six-month period ending June 30, 2010. The Company announced that total revenue

for the second quarter of 2010 decreased 9.1% to $56.1 million from $61.7 million in the same period last year.  The Company stated that this was primarily due to a decrease in foreclosure referrals, title fees, and client reimbursed costs, and that title fees decreased due to the decrease in foreclosure volume and the switch made by some clients to use their own title company.  DJSP stock closed at $3.32 per share that day.

102.   On or about October 7, 2010, the leaked transcript of the Kapusta Deposition, cited above, appeared on a foreclosure-related website.   On or about October 8, 2010, the Attorney General confirmed that the transcript was authentic.  As described above, Ms. Kapusta described in detail the Company's reckless documentation and foreclosure practices.  DJSP's counsel Jeffrey Tew, Esq. reacted to Ms. Kapusta's testimony by stating that "It's not true what she says," and that Ms. Kapusta was merely "a disgruntled employee out for revenge."

103.   On or about October 12, 2010, Citigroup, Inc., Fannie Mae and Freddie Mac announced that, at least temporarily, they would no longer refer cases to DJS.

104.   On October 14, 2010, the Company announced that it had instituted staff reductions as a result of reduced file volumes. DJSP has reduced its staffing levels by approximately 10% and continued to evaluate additional measures in response to the reduction in file volumes. The Company disclosed that file referrals from DJS had "declined dramatically following the decision by numerous national mortgage lenders to suspend new and existing foreclosure cases pending a review of foreclosure documentation and procedures."  Between October 11 and 15, 2010, DJSP stock lost approximately half of its market value, opening the week at $3.22 per share, and closing the week at $1.51 per share.

105.   On October 18, 2010, the Attorney General released the transcripts of the Scott and Cordova Depositions, cited above, as well as the deposition of an employee of another firm specializing in foreclosure proceedings.

106.   On October 19, 2010, Defendant Stern resigned from his position as

Chairman of the Company.  The Company announced that Stephen J. Bernstein, the Company's Lead Independent Director, had been appointed as Interim Chairman of the Board of the Company.  The Company further announced the voluntary resignations of Richard Powers as President and Chief Operating Officer, Kumar Gursahaney as Executive Vice President and Chief Financial Officer, and Howard S. Burnston as Vice President, General Counsel and Secretary, each of whom joined the Company in 2010. Upon information and belief, Defendant Stern again became President of the Company on that date.  On that date, DJSP stock closed at $1.30 per share.

107.    On or about November 2, 2010, Fannie Mae and Freddie Mac announced that they had severed ties with DJS, and, shortly thereafter, began to remove their files from the Company's premises.

108.    On November 5, 2010, the Company announced further staff reductions, bringing the total number of layoffs to more than 700 employees since the initial reduction in staff was initiated. In early November, Stern wrote in a letter to terminated employees that DJSP had lost more than 90 percent of its new business in the past six months. In the same letter, he wrote that 70 percent of employees will be laid off due to the company's downturn.

109.    On November 15, 2010, the Company disclosed that DAL had defaulted on a credit line and an equipment note after failing to repay money advanced by Bank of America Corp.  Also on November 15, 2010, Wells Fargo announced that it had severed ties with DJS.

110.    On November 15, 2010, DJSP common stock opened at a price of $0.71 per share, and closed at a price of $0.48 per share, a one-day loss of 32%.  It has since continued to trade at a price of approximately $0.50 per share.

111.    On November 19, 2010, the Company announced that Mr. Bernstein, the Company's Interim Chairman of the Board, had accepted the positions of Chairman of the Board, President and CEO of the Company, succeeding Stern as President and CEO.

## CLAIMS FOR RELIEF

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

112.    Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.    Defendants engaged and participated in a scheme, plan and continuous course of conduct to misrepresent and conceal the true operating and financial condition of the Company from approximately February 16, 2010 and continuing throughout the Class Period.  Such scheme was intended to and did operate as a fraud and deceit on Plaintiffs and members of the Class, in an effort to create and maintain artificially high market prices for DJSP securities, and causing them to purchase DJSP securities at artificially inflated market prices.

114.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and jointly, made untrue statements of material fact and/or failed to disclose material information in their possession regarding, *inter alia*, (a) the Company's financial condition and (b) the adequacy of the Company's and DJS's internal documentation and foreclosure policies and procedures

115.    In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.1-01, *et seq*.) and Regulation S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's financial condition and management integrity, so that the market prices of the Company's securities would be based on truthful, complete and accurate information.

116.    As detailed herein, Defendants each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including (a) causing and/or permitting the dissemination of false and misleading news releases and other communications to the investing public; (b) preparing, approving and signing SEC filings of financial statements that overstated and misrepresented the operating and financial condition of DJSP; and (c) failing to take steps to correct the lack of sound internal controls and oversight risk management, and the deficiencies and material weaknesses therein.

117.    Each of the Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

118.    Defendants' scheme operated as a fraud or deceit on Plaintiffs and the members of the Class because the false and misleading statements concerning the financial and operating condition of DJSP and DJS caused and maintained the artificial inflation in the market price of DJSP securities prices throughout the Class Period and until the truth was slowly revealed to the market.

119.    In ignorance of the fact that market prices of the DJSP securities were artificially inflated and relying, directly or indirectly, on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities traded and/or on the absence of material adverse information, Plaintiffs and the other members of the Class acquired DJSP securities during the Class Period at artificially high prices and were damaged thereby.

120.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity and had no reason to believe that the Defendants' public representations regarding DJSP were not true.  Had Plaintiffs and the other members of the Class known of the true operating and financial condition of the Company and of its other problems as referred to herein, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired DJSP securities

or, if they had purchased and/or otherwise acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

121.    As the truth about the extent and severity of the deterioration of the financial and operating condition, and the inadequacy of internal controls, of DJSP and DJS started to be released and become apparent to the market, the prices of DJSP securities plummeted. This price decline occurred as the markets continued to digest the impact and meaning of Defendants' fraudulent schemes on DJSP.  All or a significant portion of the decrease in the market prices of DJSP securities stock was due to the disclosure, revelation and/or leakage of information inconsistent with Defendants' prior disclosures and other public filings and releases.

122.    The totality of the circumstances around the decline in the trading prices of DJSP securities combine to negate any inference that the economic loss suffered by Plaintiffs and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or other facts unrelated to Defendants' fraudulent conduct as described above.

123.    As a direct and proximate result of Defendants' fraudulent scheme to artificially inflate and maintain the market prices of DJSP securities, Plaintiffs and the other members of the Class suffered economic losses in connection with their respective purchases and sales of the Company's securities during the Class Period.

124.    The resulting decline in the market prices of DJSP securities was foreseeable at the time of Defendants' misrepresentations and omissions.  Indeed, despite being aware of the consequences of their fraudulent conduct, Defendants nevertheless knowingly engaged in the alleged misconduct, which, when the truth finally emerged, caused DJSP securities' market values to collapse.

125.    Plaintiffs will rely, at least in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, the market for DJSP's publicly traded securities was an efficient market for the following reasons,

among others:

    (a)    During the Class Period, the Company's common stock met the requirements for public listing and was listed and traded on the NASDAQ, a highly efficient market.

    (b)    As a regulated issuer, the Company filed reports with the SEC.

    (c)    The Company regularly issued press releases, which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

126.   As a result, the market for the Company's publicly traded securities promptly digested current information with respect to DJSP from all publicly available sources and reflected such information in the price of the Company's securities.  Under these circumstances, all purchasers of the DJSP's publicly traded securities during the Class Period suffered similar injury through their purchase thereof at artificially inflated prices.

127.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>**COUNT II**</u>
**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

128.   Plaintiffs repeat and restate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

129.   The Defendants acted as controlling persons of DJSP within the meaning of § 20(a) of the Exchange Act.  By reason of their high-level positions with the Company, their ownership of equity in DJSP, DJS and/or DAL, their participation in the drafting, approving, and filing of false financial statements and other deceptive documents with the SEC and their dissemination to the investing public, and their participation in the fraudulent schemes and acts described herein, these Defendants had

the power and authority to control and cause DJSP to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Defendants named herein are liable to Plaintiffs and the members of the Class pursuant to §20(a) of the Exchange Act.

130.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of DJSP, the Defendants are liable to Plaintiffs and the members of the Class for their damages pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and appointing their counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.    Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demands trial by jury of all issues that may be so tried.

January 10, 2011                         Shepherd, Finkelman, Miller & Shah, LLP

                                         _/s/ Scott R. Shepherd_____
                                         Scott R. Shepherd
                                         Fla. Bar No. 69655
                                         Nathan Zipperian
                                         Fla. Bar. No. 61525
                                         1640 Town Center Circle
                                         Suite 216
                                         Weston, FL 33326
                                         954-515-0123
                                         954-515-0124 (facsimile)

                                         Jonathan W. Cuneo
                                         Charles J. LaDuca
                                         Matthew E. Miller, *pro hac vice*
                                         Cuneo Gilbert & LaDuca, LLP
                                         507 C Street, N.E.
                                         Washington, DC 20002
                                         (202) 789-3960
                                         (202) 789-1813 (facsimile)

                                         David I. Greenberger
                                         David M. Marek
                                         Liddle & Robinson, L.L.P.
                                         800 Third Avenue, 8th Floor
                                         New York, N.Y. 10022
                                         (212) 687-8500
                                         (212) 687-1505 (facsimile)

                                         **Lead Counsel for Plaintiffs**

                                         Joseph E. White III
                                         Fla. Bar No. 0621064
                                         Lester R. Hooker
                                         Fla. Bar. No. 0032242
                                         Saxena White P.A.
                                         2424 N. Federal Highway, Suite 257
                                         Boca Raton, FL 33431
                                         Telephone: (561) 394-3399
                                         Facsimile: (561) 394-3382

Richard S. Wayne, *pro hac vice*
Thomas P. Glass
John M. Levy
Strauss & Troy, LPA
150 East Fourth Street
Cincinnati, OH 45202-4018
Telephone: (513) 621-2120
Facsimile: (513) 629-9426

Jeffrey P. Harris
Melinda S. Nenning
Statman Harris & Eyrich, LLC
3700 Carew Tower
441 Vine Street
Cincinnati, OH 45202
Telephone: (513) 621-2666
Facsimile: (513) 621-4896

**Co-Counsel for Plaintiffs**