UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-61261-CIV-ZLOCH

PHILADELPHIA FINANCIAL
MANAGEMENT OF SAN FRANCISCO,
LLC; BLUE LION MASTER FUND,
L.P., a/k/a Blue Lion Capital;
STAN COOPER; NEERAJ METHI; and
GARY CURSON, DPM, individually
and on behalf of all others
similarly situated,                          **FINAL ORDER OF DISMISSAL**

     Plaintiffs,

v.

DJSP ENTERPRISES, INC.; DAVID J.
STERN; and KUMAR GURSAHANEY,

     Defendants.
_____/

     THIS MATTER is before the Court upon Defendants' Motion To

Dismiss (DE 44).  The Court has carefully reviewed said Motion, the

entire court file and is otherwise fully advised in the premises.

I.   **Complaint Allegations**[1]

     Defendant DJSP Enterprises, Inc. ("DJSP") performs processing

services for residential mortgage foreclosures and related matters.

DJSP provides these services exclusively to the Law Offices of

David J. Stern, P.A. ("LODJS"), a law firm that represents mortgage

holders in foreclosure proceedings.  During the time period

relevant here, Defendant David J. Stern, the sole owner of LODJS,

served as the president, chief executive officer, and chairman of

DJSP, and Defendant Kumar Gursahaney served as its executive vice

_____

     [1] The facts recited here, taken mainly from Plaintiffs'
Consolidated Amended Complaint (DE 38), are accepted as true for
purposes of this Motion.  See Tellabs, Inc. v. Makor Issues &
Rights, Ltd., 551 U.S. 308, 322 (2007).

president and chief financial officer.[2]   Throughout the relevant time period, DJSP's common stock and warrants[3] were publicly traded on the NASDAQ market.

A.   **Corporate Formation**

Plaintiffs' Complaint describes the process by which DJSP was formed.   The Court will summarize this process as it pertains to the claims at issue here.   The original corporate entity, called Chardan 2008 China Acquisition Corp. ("Chardan"), was incorporated in February 2008.   That same year, Chardan issued approximately 11 million warrants ("the Chardan warrants"), each of which could be exercised to purchase one share of the company's common stock for $5.00.   The majority of these warrants, issued as part of the company's initial public offering, could be redeemed by the company for $0.01 each after giving 30 days' notice, but only if two conditions were met:   (1) the shares underlying the warrants were registered pursuant to a registration statement declared effective by the Securities and Exchange Commission (SEC), and (2) the closing price of the company's stock equaled or exceeded $10.00 for 20 out of 30 consecutive trading days.   If these conditions were satisfied and the company proceeded to redeem the warrants, virtually all of the warrants would be exercised first, since the market price of the company's shares would almost certainly exceed

---

[2]   This Order refers collectively to DJSP, Stern, and Gursahaney as "Defendants."

[3]   A warrant is "[a]n instrument granting the holder a long-term (usu. a five- to ten-year) option to buy shares at a fixed price." Black's Law Dictionary 1724 (9th ed. 2009).

the exercise price ($5.00) by an amount greater than the redemption price ($0.01).

In December 2009, Chardan agreed to purchase a majority ownership interest in certain businesses owned by Stern that performed non-legal services (including processing, title, and liquidation services) in support of the legal services provided by LODJS. The assets of these businesses were transferred to three limited-liability companies that were subsidiaries of DAL Group, LLC ("DAL"). As part of the transaction, Stern would receive from DAL a total payment of $146 million, consisting of three parts: (1) an initial cash payment of about $58.5 million, (2) a note in a principal amount of approximately $52.5 million, and (3) an additional payment of $35 million after the note was paid in full. In addition, Chardan received warrants to purchase approximately 11 million equity units in DAL ("the DAL warrants"), which Chardan was required to exercise if the corresponding Chardan warrants were exercised. Therefore, whatever funds Chardan received from the exercise of the Chardan warrants would essentially pass through to DAL and, ultimately, to Stern. The transaction also included other terms to ensure that DAL promptly paid Stern the amounts owed to him, using revenues from its business operations and funds received from the exercise of the DAL warrants. These terms included a promise by Chardan to redeem the Chardan warrants as soon as the conditions needed to do so were met.

On January 15, 2010, Chardan's purchase of the majority interest in DAL was finalized. As of that date, Chardan was

renamed DJSP Enterprises, Inc., and the company became publicly traded under that name.

## B.   Business Operations

Although LODJS's legal services were officially separate from the non-legal services performed by DJSP, as a practical matter, the legal and non-legal businesses remained closely linked.  LODJS was DJSP's only customer, and, by contract, DJSP provided substantially all of the non-legal support services required by LODJS.  Also, LODJS and DJSP operated out of the same facility.

Plaintiffs allege that before and during the time period relevant to this case, employees of LODJS and DJSP, acting at the direction of Stern and other supervisors, routinely engaged in unethical and illegal practices in the handling of foreclosure actions, including the following:

- churning out a large volume of foreclosure documents with no regard for their accuracy, including signing court filings without ever reading them;

- notarizing legal instruments outside the presence of the signors and often long before or after the documents were signed, passing around notary stamps to be used indiscriminately by employees other than the designated notaries public, and backdating notarizations on documents using notary stamps that did not exist until months after the documents were originally filed;

- copying the signature page of a document concerning one property and attaching it to a document regarding another property, instead of obtaining a true signature for the second document;

- concealing improprieties from outside parties by altering case chronologies, temporarily changing client codes on files, and hiding files;

4

- mismanaging, and often losing, mortgage documents;

- signing affidavits of attorney's fees with no amounts filled in and having paralegals later write in the amounts;

- using social-security numbers for other people when performing searches to determine whether missing property owners were in military service;

- refusing to speak with homeowners who called with complaints, even when their concerns were legitimate; and

- imposing excessive and unjustified fees on homeowners.

### C. Public Statements

Plaintiffs further claim that while this improper conduct was occurring, Stern was attempting to drive up DJSP's stock price. According to Plaintiffs, Stern wanted the stock price to rise above $10.00 per share—a value it had never before seen—and remain at that level long enough to trigger the exercise of the Chardan and DAL warrants.[4]  This would accelerate payment of the remaining $87.5 million owed to Stern and eliminate the possibility that he would never be paid in full due to a downturn in DJSP's business. For the same reasons, Stern was also trying to meet the second condition for redeeming the Chardan warrants, namely, obtaining SEC approval of a registration statement allowing the shares issued upon the exercise of those warrants to be publicly traded.

---

[4] More precisely, keeping the stock price above $10.00 would (1) cause the company to seek redemption of the redeemable portion of the Chardan warrants, effectively compelling the holders of those warrants to exercise them; and (2) encourage holders of the nonredeemable Chardan warrants to exercise those warrants voluntarily.  The exercise of the Chardan warrants would, in turn, require the company to exercise the corresponding DAL warrants.

5

In furtherance of this plan, DJSP, Stern, and Gursahaney made a series of statements, in SEC filings and other public forums, about DJSP's business practices and expected financial performance. Plaintiffs claim that these statements were materially false and misleading because they misrepresented or concealed the true nature of DJSP's operations and financial prospects. The statements that Plaintiffs identify as false and misleading are discussed below.

On February 16, 2010, DJSP filed with the SEC the first version of a registration statement, signed by Stern, Gursahaney, and other company directors. In this and later versions of the registration statement filed during the first half of 2010, as well as in other SEC filings,[5] Defendants made various statements about the processes used by DJSP and LODJS to ensure the efficient and accurate handling of foreclosures and related matters—for example:

- [DJSP] relies heavily on a proprietary case management software system, which stores, manages and reports on the large amount of data associated with each foreclosure, bankruptcy, REO liquidation or eviction case file we process, to achieve a high level of efficiency, accuracy and customer service.

- Through extensive investment in its leading-edge IT, development of scalable proprietary processes as a centralized facility, and hiring and training of the staff needed to conduct operations at a large scale, we are well positioned to maintain a competitive advantage in an industry generally populated by smaller firms.

---

[5] Three of DJSP's filings with the SEC—the February 16, 2010, registration statement; an April 2, 2010, annual report signed by Gursahaney; and a slide presentation that Stern and Gursahaney gave at an investment conference on March 16, 2010—are attached to Defendants' Motion to Dismiss. See DE 44-1, 44-2, and 44-3. In evaluating Defendants' Motion, the Court may take judicial notice of these and other relevant SEC filings. See Thompson v. RelationServe Media, Inc., 610 F.3d 628, 631 n.5 (11th Cir. 2010).

- Our IT systems allow us to interact efficiently with clients and reduce processing time while minimizing human error in handling approximately 5,000 new files that we currently receive[] for processing on average in a month.

- A key factor in this success is the ongoing implementation of leading edge IT solutions that optimize interface and data transfer activities with clients and improve processing time while reducing human error. We also deliver effective staff training to ensure the efficient and effective processing of all referrals.

- Clients demand high levels of service from the firms handling the mortgage foreclosure process, with a particular emphasis on the process rigor, efficiency and accuracy with which the firms complete the foreclosure process. All the major lenders have a well defined process for foreclosure filings, and they expect their law firm vendors to conform to the bank foreclosure process in order to monitor progress and minimize losses throughout the process. This process efficiency is critical, as faster foreclosures mean fewer missed payments by borrowers and fewer delinquency payments made by loan servicers to investors on behalf of delinquent borrowers. Accuracy is also critical, as any resubmission of paperwork or additional court hearings extend the foreclosure process and impose additional cost. Reputation of the law firm and tenure of the partner are also additional client considerations.

- We have . . . developed rigorous processes tailored to the needs of each of [LO]DJS'[s] clients as a result of having processed a significant percentage of their case volume over many years of service. We have also invested in proprietary technology over the years to achieve high efficiency and minimal foreclosure processing time. We believe that, in combination with the increasing case volumes, rising client expectations, and high barriers to entry with respect to the substantial minimum technological requirements to achieve efficiency, we are uniquely positioned to capitalize on opportunities for further growth in its current and future markets.

- [LO]DJS has made significant investments in

technology, processes and staff in order to meet the requirements for foreclosure actions throughout Florida.

On February 17, 2010, DJSP issued a press release announcing its full-year earnings guidance for 2010. The company stated that it expected to report adjusted net income of about $49 million and adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) of approximately $80.6 million, excluding one-time expenses associated with the purchase of a majority interest in DAL.

On March 11, 2010, DJSP issued another press release reporting its financial results for the prior year. This release included the following quotation from Stern:

> DJSP delivers unparalleled customer service by combining unique mortgage and foreclosure expertise with highly automated electronic processing. This efficiency has historically enabled us to significantly grow both our top and bottom-line results. As a public company we will be able to leverage our expertise, diversify our service offerings, and expand geographically in order to accelerate our growth and enhance our client relationships. Going forward, we are particularly excited about our REO business which will become an increasingly significant source of revenue and income growth in the coming years.

In addition, the release reaffirmed DJSP's previously announced earnings guidance for 2010.

Between March and May 2010, Defendants held "roadshows" to promote DJSP's securities to market analysts and potential investors. According to Plaintiffs, these roadshows were unusual because Defendants were not promoting a _future_ offering of

securities but instead were seeking to create interest in the company's existing shares in order to bolster their price.

At a March 16, 2010, investment conference in California, Stern and Gursahaney gave a slide presentation, which DJSP separately filed that day with the SEC. The presentation highlighted, among other favorable points, DJSP's "unparalleled customer service" and its "[t]ransition to [a] paperless system to increase reliability, efficiency and margins." The presentation also reiterated the company's prior earnings guidance for 2010. As part of the presentation, Stern stated,

> Historical foreclosure growth, foreclosures have experienced sustained growth for over 25 years at an annual rate of approximately 12%, foreclosure volumes are expected by DJSP and by all my comps to continue to grow to historical height. Near term outlook, loans past due the leading indicator for the future foreclosures it continues to increase. No matter what Obama rolls out, there is no stopping this inflow of continued defaults that we anticipate to go for another two or three years. . . . REO [(real estate owned by foreclosing mortgage holders)] . . . need[s] to be liquidated and at the end of the day, the cycle will start again. Well, foreclosure volumes through 2012 are expected to increase dramatically and remain at high levels going on till 2017.
>
> . . . .
>
> We currently only represent one client. We expect to increase that in the year 2010 by adding one and only one additional client to achieve that 100% increase and keep in mind, we represent 17 out of the top 20 lenders in the country and we really have not solicited to this day additional REO business because we kept it under an exclusive which is no longer applicable.

Further, with regard to a $75 billion homeowner-relief program implemented by the federal government, Stern remarked that "[f]ortunately, it is failing." Stern went on to explain how DJSP would profit from this and other government programs designed to help homeowners avoid foreclosure:

> So no matter what the Obama administration brings our way, we have found the way to create a profit center on it and that I think is part of the success.
>
> . . . .
>
> So I don't think we are going to see really any bumps. I think we are going to see all of the operating subsidiaries really jump out especially with what's being pushed through the systems. In my office alone, I have over 15,000 foreclosures that simply need to be set for sale. When they are set for sale because they are under HAMP [(Home Affordable Modification Program)] review, when they are set for sale not only do I get $250 for resetting each of them but once they are reset if when they are sold, they will go back to the GFE where under my contract I do cradle to grave then I get to do the closing on them, $250 for stock price, plus $250 for closing fee, $400 for title search, title exam, title update and then I get a right to title policy and if there is a lender involved, I get a right to lender's policy. So it all flows nicely, yes sir.

On April 22, 2010, Defendants held a conference call with securities analysts. During the call, Gursahaney reaffirmed DJSP's guidance for 2010, and Stern expressed his belief that this guidance was "conservative." Further, Stern stated that he was not overly concerned by HAMP and that the company was well positioned to adjust to, and even profit from, the procedures implemented by that program.

In mid-May 2010, Defendants held additional roadshows in New York and possibly Boston. Plaintiffs allege, "upon information and belief," that Defendants repeated the optimistic statements they had made at the March 16 conference and did not change their previous earnings guidance.

Defendants' promotion of DJSP's business was apparently working. In March and April 2010, the company's stock price rose above $12.00 per share. Moreover, the stock price exceeded $10.00 per share for 20 out of 30 consecutive trading days, thereby satisfying one of the requirements for redemption of the Chardan warrants.

Yet Defendants were having trouble meeting the second requirement for redeeming the warrants: obtaining SEC approval of a registration statement for the shares underlying the warrants. Between March and May 2010, DJSP filed three revised versions of its proposed registration statement, in response to letters from the SEC requiring various changes.

As of May 27, 2010, the SEC had not yet responded to DJSP's latest registration statement, and the company's stock price had dropped below $10.00. On that date, DJSP announced its financial results for the first quarter of 2010. The company reported that total revenue had increased by 30 percent compared to the first quarter of 2009, but that most of this increase was attributable to growth in the company's REO business rather than in its core business of foreclosure processing. In fact, DJSP announced that "[d]uring the first quarter of 2010 the pace of new foreclosures

slowed." Additionally, the company adjusted its earnings guidance for 2010, lowering its forecast of adjusted net income by $15 million to $17 million (a reduction of about 33 percent from the original guidance) and its estimate of adjusted EBITDA by $18 million to $22 million (a reduction of about 25 percent). The new 2010 guidance predicted adjusted net income of $32 to $34 million and adjusted EBITDA of $58 to $62 million. The company attributed its lowered guidance to two factors: (1) a foreclosure system conversion by one of LODJS's largest bank clients, which had reduced the number of foreclosure files referred by the client; and (2) a temporary slowdown in foreclosures due to government intervention programs.

On a conference call with analysts the following day, Stern explained that in addition to the overall slowdown in foreclosures during the first quarter, "even more impactful in the short term, one of our largest clients initiated a systems conversion following a recent merger that will impact foreclosure referral volume in the second quarter and may continue into Q3." More specifically, Stern stated that

> [b]eginning in April, we learned that one of our largest clients initiated a foreclosure system conversion, causing a decrease in foreclosure volume in the month of April and again in the month of May. Although this is a temporary reduction, we are unsure if it will continue into the third quarter.

In discussing this issue further, Stern also acknowledged that government intervention programs had reduced the number of foreclosures:

> To reiterate, this downward adjustment is directly attributed to a reduction in foreclosure case volumes by the impact of governmental intervention and more accurately by the system conversion delays at a major client we serve. All indicators point to increase[d] file volumes on the horizon. However, we cannot determine with certainty when the foreclosure pipeline will begin to resolve itself. Therefore, we feel it prudent to make the adjustment previously discussed.

In view of Stern's recent optimistic statements about the company's prospects, one analyst expressed concern about the sudden revelation of these problems:

> I mean, we all have issues in a business that don't go away, but I mean, just last week, you were marketing in New York, talking about the quarter and reiterating to several clients that everything was fine in your business, and I'm very troubled ethically and legally that you would go out on a marketing trip and say such things when clearly, you know, a week later you announce 20% lower numbers. I mean, is that ethically legal?  Is that, I mean, you're an attorney, do you feel comfortable with your actions?

Following the announcement of DJSP's reduced earnings guidance, its stock price dropped sharply. On May 27, the last trading day before the announcement, the company's shares closed at $8.87, on a volume of 412,500 shares traded. On May 28, the first trading day after the revised guidance was announced, DJSP's stock closed at $6.38—a 28 percent decrease from the prior day's closing price—on a volume of 4,931,300 shares traded.

On June 25, 2010, the SEC declared effective DJSP's registration statement for the Chardan warrant shares, and the company issued a prospectus for those shares. By that time,

13

however, DJSP could no longer redeem the Chardan warrants because the company's stock was then trading at around $6.25 per share.

###    D.    DJSP's Decline

Over the next several months, DJSP suffered a series of adverse events, and its stock price continued to fall.  On August 3, 2010, Mother Jones magazine published an article about Defendants and LODJS titled _Fannie and Freddie's Foreclosure Barons_, which described many of the improper foreclosure practices alleged by Plaintiffs here.  About a week later, on August 11, 2010, the Florida Attorney General announced that he was investigating LODJS and certain other law firms that represented mortgage holders in foreclosure proceedings.  The Attorney General stated that these firms may have used fabricated documents in court to obtain thousands of foreclosure judgments against Florida homeowners.  Through his attorney, Stern denied these allegations.

On September 7, 2010, DJSP announced its second-quarter financial results, reporting that total revenue had declined by about nine percent from the year-earlier period, in part because of a decrease in foreclosure referrals.  That day, DJSP's stock closed at $3.32.

In October 2010, DJSP's business began to unravel.  On October 7, an employee deposition taken as part of the Attorney General's investigation and detailing the company's alleged improper practices became public.  On October 12, Citigroup Inc., Fannie Mae, and Freddie Mac announced that, at least temporarily, they would no longer refer cases to LODJS.  On October 14, DJSP

announced that it had reduced its staff by about 10 percent due to a sharp drop in foreclosure referrals.  The company reported that referrals from LODJS had "declined dramatically following the decision by numerous national mortgage lenders to suspend new and existing foreclosure cases pending a review of foreclosure documentation and procedures."  Between October 11 and October 15, DJSP's stock lost more than half its remaining market value, opening the week at $3.22 per share and closing at $1.51 per share. On October 18, the Attorney General released additional depositions from his investigation, further detailing the company's improper foreclosure practices.  On October 19, Stern resigned as DJSP's chairman (though he remained its president and CEO), and Gursahaney resigned as the company's executive vice president and chief financial officer.

November 2010 brought even worse developments for DJSP.  On November 2, Fannie Mae and Freddie Mac announced that they had severed ties with LODJS and soon thereafter began removing their files from the firm's premises.  On November 5, DJSP announced further staff reductions, bring its total number of layoffs to more than 700 employees.  In a letter to terminated employees, Stern wrote that DJSP had lost more than 90 percent of its new business in the past six months and that, as a result, 70 percent of employees would be laid off.  On November 15, the company disclosed that DAL had defaulted on a bank credit line and equipment note, and Wells Fargo announced that it had cut ties with LODJS.  That same day, DJSP's stock declined by 32 percent, closing at $0.48 per

share.   On November 19, DJSP announced that the company's interim chairman had accepted the positions of chairman, president, and CEO, succeeding Stern in the latter two positions.

## II.  Procedural History

On July 20, 2010, Plaintiffs Stan Cooper and Neeraj Methi filed the original Complaint in this action.  See DE 1.  Plaintiffs alleged that in the spring of 2010, Defendants made a series of public statements touting DJSP's business and future prospects but failed to disclose that DJSP was experiencing a significant downturn in its foreclosure-processing business due to a system conversion by one of LODJS's largest clients and government intervention programs.   Plaintiffs claimed that Defendants' misrepresentations and omissions caused Plaintiffs to purchase DJSP's securities at artificially inflated prices, resulting in monetary losses when Defendants finally revealed the downturn in late May 2010.   Plaintiffs' original Complaint pled a securities-fraud claim against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("the Act") and SEC Rule 10b-5,[6] as well as a controlling-persons claim against Stern and Gursahaney under Section 20(a) of the Act.[7]   In addition to their own claims, Plaintiffs sought to represent a class "consisting of all those who purchased DJSP's securities between March 16, 2010 and May 27,

---

[6] See 15 U.S.C. § 78j(b), amended by Pub. L. No. 111-203, § 762(d)(3), 124 Stat. 1376, 1761 (July 21, 2010); 17 C.F.R. § 240.10b-5 (2010).

[7] See 15 U.S.C. § 78t(a), amended by Pub. L. No. 111-203, § 929P(c), 124 Stat. 1376, 1865 (July 21, 2010).

2010, inclusive, and who were damaged thereby." Id. at 18.

On October 6, 2010, Defendants moved to dismiss Plaintiffs' original Complaint, arguing that it failed to satisfy the pleading requirements for private securities-fraud claims. See DE 11. On October 21, 2010, the Court granted Plaintiffs' Motion To Stay Consideration Of Defendants' Motion To Dismiss pending the Court's rulings on two motions seeking appointment as lead plaintiff and approval of lead counsel. See DE 24. On November 24, 2010, the Court granted a joint Motion, filed by all the present Plaintiffs, to appoint Philadelphia Financial Management of San Francisco, LLC ("PFM") as lead plaintiff in this action and to approve PFM's selection of lead counsel. See DE 36. The Court also granted a request in the joint Motion to allow PFM until January 10, 2011, to file a proposed amended complaint incorporating "'an abundance of new information about DJSP, its operations and business prospects that has become public since the filing of the initial Complaint.'" Id. at 8 (quoting DE 35 at 3).

On January 10, 2011, Plaintiffs filed their Consolidated Amended Complaint, which sets forth the allegations described in Part I above. See DE 38. Like the original Complaint, Plaintiffs' Amended Complaint alleges that Defendants made false and misleading public statements about the strength of DJSP's foreclosure-processing business and that Plaintiffs, all of whom purchased DJSP's securities, suffered financial losses when Defendants finally revealed the slowdown in this business in late May 2010. Further, the Amended Complaint claims that Defendants publicly

17

represented that DJSP processed foreclosures efficiently and accurately—when, in fact, its operations were plagued by unethical and illegal shortcuts—and that Plaintiffs suffered additional losses as the truth about DJSP's business practices gradually became public over the course of 2010. The Amended Complaint also alleges that Defendants had a strong motive to conceal the true nature of DJSP's business prospects and operations, specifically, inflating the company's stock price in order to trigger the exercise of warrants and thereby accelerate payment of the remaining money that DAL owed to Stern. As in the original Complaint, Plaintiffs assert a claim against all Defendants under Section 10(b) and Rule 10b-5, along with a claim against Stern and Gursahaney under Section 20(a). Based on the new factual allegations in the Amended Complaint, Plaintiffs have expanded their proposed class to include "all persons and entities who purchased or otherwise acquired DJSP securities during the period from February 16, 2010 through November 15, 2010, inclusive . . . and were damaged thereby." Id. at 4.

On February 9, 2011, Defendants filed the present Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). See DE 44. As in their previous dismissal motion, Defendants contend that Plaintiffs' Amended Complaint fails to meet the applicable pleading requirements, especially those imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). See 15 U.S.C. § 78u-4(b)(3)(A) (requiring dismissal of a private securities-fraud complaint that fails to meet the PSLRA's pleading standards).

18

Plaintiffs have filed a Response (DE 45) opposing Defendants'
Motion to Dismiss, and Defendants have filed a Reply (DE 47) in
support of the Motion.

## III. Analysis

### A.    Legal Standards

#### 1.    Elements of Plaintiffs' Claims

Plaintiffs' primary claim is that Defendants violated Section
10(b) of the Act and Rule 10b-5 by making material
misrepresentations and omissions in SEC filings, press releases,
and other public statements.  Section 10(b) makes it unlawful to

> use or employ, in connection with the purchase
> or sale of any security registered on a
> national securities exchange or any security
> not so registered . . . any manipulative or
> deceptive device or contrivance in
> contravention of such rules and regulations as
> the Commission may prescribe as necessary or
> appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j(b).  As relevant here, Rule 10b-5 prohibits
"mak[ing] any untrue statement of a material fact or . . .
omit[ting] to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which they
were made, not misleading."  17 C.F.R. § 240.10b-5(b).  The Supreme
Court has recognized that Section 10(b) (and Rule 10b-5 promulgated
thereunder) "affords a right of action to purchasers or sellers of
securities injured by its violation."  Tellabs, Inc. v. Makor
Issues & Rights, Ltd., 551 U.S. 308, 318 (2007).  Under these
provisions, a securities-fraud claim based on failure to disclose

19

information to investors has six elements: (1) a material misrepresentation or omission, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) a causal connection between the misrepresentation or omission and the economic loss, referred to as "loss causation." See Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1236-37 (11th Cir. 2008) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

Plaintiffs also claim that Stern and Gursahaney are liable as "controlling persons" of DJSP under Section 20(a) of the Act, which provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). As the Eleventh Circuit has explained, "[t]his statute imposes derivative liability on persons that control primary violators of the Act." Mizzaro, 544 F.3d at 1237 (internal quotation marks omitted). To state a claim under Section 20(a), Plaintiffs must allege that (1) DJSP committed a primary violation of the securities laws, (2) Stern and Gursahaney "had the power to control the general business affairs" of DJSP, and (3) Stern and Gursahaney "'had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted

20

in primary liability.'" <u>Id.</u> (<u>quoting</u> <u>Theoharous v. Fong</u>, 256 F.3d 1219, 1227 (11th Cir.2001)). Because controlling-persons liability depends on a primary violation of the securities laws, Plaintiffs' claim under Section 20(a) will survive dismissal only if Plaintiffs have adequately pleaded a claim under Section 10(b) and Rule 10b-5. <u>See</u> <u>id.</u>

In the instant Motion To Dismiss (DE 44), Defendants argue that Plaintiffs' Amended Complaint does not adequately plead the first two elements of a securities-fraud claim: that Defendants made a material misrepresentation or omission and that they did so with the necessary scienter. Defendants also contend that their alleged statements about DJSP's expected financial performance are protected by the statutory safe harbor for forward-looking statements. <u>See</u> 15 U.S.C. § 78u-5(c).

## 2.   Falsity and Materiality

To prove a claim under Section 10(b) and Rule 10b-5, "a plaintiff must show that the [defendant's] statements were <u>misleading</u> as to a <u>material</u> fact." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 238 (1988) (emphasis in original). In alleging a misleading statement or omission, a securities-fraud plaintiff must, as with any fraud claim, "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); <u>see</u> <u>Mizzaro</u>, 544 F.3d at 1237. Moreover, in a private securities-fraud action such as this one, the PSLRA mandates that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

But "[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." Basic, 485 U.S. at 238. Thus, the plaintiff must also show that the alleged misrepresentation or omission concerned a material fact. See id. In Basic, the Supreme Court adopted, for claims under Section 10(b) and Rule 10b-5, a materiality standard that it had previously applied to claims based on misleading proxy statements:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . [This standard requires] a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

TSC Indus. v. Northway, Inc., 426 U.S. 439, 449 (1976) (footnote omitted); see Basic, 485 U.S. at 231-32, 249. In general, therefore, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." Basic, 485 U.S. at 240; accord TSC Indus., 426 U.S. at 445.

### 3. Scienter

The PSLRA also imposes a heightened pleading standard for claims, like those alleged here, requiring proof of scienter. Specifically, "with respect to each act or omission alleged to violate this chapter," the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2), amended by Pub. L. No. 111-203, § 933(b)(1), 124 Stat. 1376, 1883 (July 21, 2010).   Further, "the complaint must allege facts supporting a strong inference of scienter 'for each defendant with respect to each violation.'"  Mizzaro, 544 F.3d at 1238 (quoting Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1016 (11th Cir. 2004)).

To prove scienter for a claim under Section 10(b) and Rule 10b-5, the plaintiff must normally show "either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'"  Id. (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999)).   The Eleventh Circuit has explained that "severe recklessness"

> is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Bryant, 187 F.3d at 1282 n.18 (internal quotation marks omitted); see also Merck & Co. v. Reynolds, 130 S. Ct. 1784, 1796 (2010) ("A plaintiff cannot recover without proving that a defendant made a material misstatement with an intent to deceive—not merely

innocently or negligently." (emphasis in original)). This substantive standard, combined with the PSLRA's pleading requirement, demands that a plaintiff plead "with particularity facts giving rise to a strong inference" that the defendant either intended to defraud investors or was severely reckless in making the alleged material misrepresentations and omissions. See Mizzaro, 544 F.3d at 1238.

The Supreme Court has held that a "strong inference" of scienter is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. In deciding whether a securities-fraud complaint satisfies this test, the court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323 (emphasis in original). In so doing, the court must engage in a "comparative inquiry" that "take[s] into account plausible opposing inferences":

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.

Id. at 323-24 (citation omitted).  "In sum," Tellabs explained, "the reviewing court must ask:  When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  Id. at 326; see Reynolds, 130 S. Ct. at 1796 ("[U]nless a § 10(b) plaintiff can set forth facts in the complaint showing that it is 'at least as likely as' not that the defendant acted with the relevant knowledge or intent, the claim will fail." (quoting Tellabs, 551 U.S. at 328)).

### 4.    Safe Harbor

Aside from the normal pleading requirements for private claims under the Act, the PSLRA provides securities-fraud defendants with a "safe harbor" from liability for certain "forward-looking statements." 15 U.S.C. § 78u-5(c).[8]  "Congress enacted the safe-harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company."  Harris v. Ivax Corp., 182 F.3d 799, 806 (11th Cir. 1999).  As pertinent here, the PSLRA defines a "forward-looking statement" to include

> (A)  a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

---

[8] Although the safe-harbor statute excludes certain types of forward-looking statements from its protection, see 15 U.S.C. § 78u-5(b), these exclusions appear to be inapplicable here, and Plaintiffs do not contend otherwise.

(B)   a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C)   a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; [and]

(D)   any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)[.]

15 U.S.C. § 78u-5(i)(1).

Under the statutory safe harbor, a defendant may avoid liability for any forward-looking statement that is false or misleading if the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).[9] If a forward-looking statement meets these conditions, then the defendant is protected from liability, regardless of any fraudulent intent in making the statement. See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 795 (11th Cir. 2010) ("So long as the language accompanying the projections is meaningfully cautionary, the law requires us to be unconcerned with the speaker's state of mind at the time he makes the projections."); Harris, 182 F.3d at 803

---

[9] For oral forward-looking statements, the PSLRA specifies more detailed requirements for making the disclosures necessary for safe-harbor protection. See 15 U.S.C. § 78u-5(c)(2).

("[I]f a [forward-looking] statement is accompanied by 'meaningful cautionary language,' the defendants' state of mind is irrelevant."). Even if a forward-looking statement does not include the required disclosures, it is nonetheless protected if the plaintiff fails to prove that the defendant made the statement with "actual knowledge" that it was "false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). This heightened scienter standard is also subject to the PSLRA's "strong inference" pleading requirement. See Theoharous, 256 F.3d at 1226 (explaining that because certain statements were forward-looking, "the plaintiffs were required to allege particular facts creating a strong inference that [the defendant] knew that the statements were false"), abrogated on other grounds by Reynolds, 130 S. Ct. at 1798. Additionally, the safe-harbor statute precludes liability for forward-looking statements that are immaterial. See 15 U.S.C. § 78u-5(c)(1)(A)(ii).[10]

**B.   Statements About Business Practices**

As discussed above in Part I.C., Plaintiffs allege that Defendants made various statements representing that DJSP employed "rigorous" processes to ensure the "efficient" and "accurate" handling of foreclosures. Plaintiffs claim that these statements were false and misleading because they failed to disclose that DJSP routinely engaged in improper shortcuts and that its processes

---

[10] This provision essentially reinforces, for forward-looking statements, the existing materiality requirement for actionable misrepresentations or omissions. See Mizzaro, 544 F.3d at 1236-37.

"were, in fact, entirely chaotic and in substantial disarray." DE 38 at 18. Defendants argue, however, that these statements were not false or misleading and were, at most, "non-actionable puffery." DE 44 at 5 n.5; DE 47 at 2. The Court agrees with Defendants.

First, Plaintiffs have not adequately alleged that Defendants' statements about DJSP's operations were false or misleading. Viewed in context, Defendants' references to "efficiency" and "accuracy" mainly concern DJSP's use of technology to streamline foreclosure processing and, to a lesser extent, the company's hiring and training of employees to handle its large volume of work. See, e.g., DE 38 at 18 ("[DJSP] relies heavily on a proprietary case management software system . . . to achieve a high level of efficiency, accuracy and customer service." (emphasis omitted)); id. at 19 ("Through extensive investment in its leading-edge IT, development of scalable proprietary processes as a centralized facility, and hiring and training of the staff needed to conduct operations at a large scale, we are well positioned to maintain a competitive advantage in an industry generally populated by smaller firms." (emphasis omitted)); id. ("A key factor in this success is the ongoing implementation of leading edge IT solutions that optimize interface and data transfer activities with clients and improve processing time while reducing human error. We also deliver effective staff training to ensure the efficient and effective processing of all referrals." (emphasis omitted)); id. at 21 ("DJSP delivers unparalleled customer service by combining

unique mortgage and foreclosure expertise with highly automated electronic processing. This efficiency has historically enabled us to significantly grow both our top and bottom-line results."). Nowhere do Plaintiffs allege that DJSP did not use the technology it claimed or that these systems did not improve the firm's efficiency and accuracy in processing foreclosures. Similarly, while Plaintiffs allege that DJSP mistreated its employees, Plaintiffs do not dispute that the company hired and trained many workers in an effort to manage the rapidly growing number of foreclosure files referred by LODJS. Indeed, Plaintiffs acknowledge that DJSP constantly hired and trained new employees to keep up with the skyrocketing demand for its services. See DE 38 at 8 (recognizing that the number of employees quadrupled between early 2008 and mid-2009 and that "[o]rientations for new hires were a near-weekly affair").

Second, and more important, Defendants' statements about the "rigor" of DJSP's processes, the "efficiency" and "accuracy" of its operations, and its "effective" staff training were not material. As a general matter, all of these traits would have been important to the success of DJSP's foreclosure-processing business. But as used in the statements identified by Plaintiffs, these terms do not assert specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell DJSP's securities. See Basic, 485 U.S. at 240; In re BankAtlantic Bancorp., Inc. Sec. Litig., Case No. 07-61542-CIV-UNGARO, 2011 WL 1585605, at *32 (S.D. Fla. Apr. 25, 2011) ("For a statement to be an actionable

29

misrepresentation, it must be of a definite factual nature." (citing Va. Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095 (1991))). Rather, Defendants' statements make the kind of vaguely positive assertions that courts have characterized as non-actionable "puffery." See, e.g., ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 205-06 (2d Cir. 2009) (holding that company's statements about its "highly disciplined" risk-management processes, its strong reputation for "integrity," and its "focus on financial discipline" were "merely generalizations regarding [the firm's] business practices" and therefore "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable" (internal quotation marks omitted)); In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 179-80 (D.D.C. 2007) (holding that company's statements describing its business model as "cost effective," "smart," "sound," and "efficient" were "vague and incapable of objective verification" and thus "not the type of statement upon which a reasonable investor would rely in considering the 'total mix' of facts available" (internal quotation marks omitted)).[11]

---

[11] Moreover, the Court notes that the ending date of Plaintiffs' proposed class period, November 15, 2010, coincides with DJSP's disclosure that DAL had defaulted on a bank credit line and equipment note and Wells Fargo's announcement that it had ended its relationship with LODJS. While these events are arguably related to the public revelation of DJSP's alleged improper business practices, Plaintiffs' selection of this date as the point at which Defendants' alleged concealment of the improper conduct ended seems arbitrary. The Court understands Plaintiffs' theory that the facts about DJSP's misconduct became public over an

In sum, Plaintiffs have failed to allege adequately that Defendants made false or misleading material statements about DJSP's operational practices. Therefore, the Court will grant Defendants' Motion to Dismiss with respect to these statements.[12]

### C.   Statements About Financial Performance

The other category of statements that Plaintiffs allege were false and misleading—those involving DJSP's business prospects and expected financial results—are forward-looking statements subject to the PSLRA's safe-harbor provisions. See 15 U.S.C. § 78u-5(c). These statements included projections of DJSP's earnings, comments on management's plans and objectives for future operations, other observations about the company's future economic performance, and assumptions underlying these predicted events. See 15 U.S.C. § 78u-5(i)(1)(A)-(D); supra Part I.C.[13]

---

extended time. Still, the absence of any clear point at which all the allegedly concealed conduct became public knowledge further confirms that Defendants' earlier statements about DJSP's operations did not include any specific misstatements or omissions of material facts.

[12] In concluding that Defendants are not liable for their statements about DJSP's business practices, the Court in no way minimizes the seriousness of the underlying conduct alleged by Plaintiffs. These allegations, if proven in other proceedings, may show that Defendants engaged in illegal—and reprehensible—conduct. But in this action claiming securities fraud, the Court's inquiry is limited to whether Plaintiffs have properly alleged that Defendants made false and material public statements about DJSP's operations. For the reasons discussed herein, the Court answers this question in the negative.

[13] Plaintiffs contend that some of Defendants' statements were not forward-looking because they included representations of existing facts concerning the effects of government intervention programs on DJSP's business. See DE 38 at 22 (statement at March 16, 2010, investment conference that "[f]ortunately, [HAMP] is

Further, most of the allegedly fraudulent statements concerning DJSP's financial outlook were identified as forward-looking statements and were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). For example, Stern and Gursahaney's March 16, 2010, slide presentation, which included DJSP's original earnings guidance for 2010, disclosed that the presentation "contain[ed] forward-looking statements within the meaning of the [PSLRA] about DJSP . . . ." DE 44-3 at 3.[14] This disclosure further explained that the forward-looking statements were "subject to risks and uncertainties, which could cause actual results to differ from the forward looking statements." Id. Among

---

failing"); id. at 23 (statement at same conference that "no matter what the Obama administration brings our way, we have found the way to create a profit center on it and that I think is part of the success" (emphasis omitted)); id. at 24 (statement on April 22, 2010, analyst call that DJSP was well positioned to adjust to, and even profit from, the procedures implemented by HAMP). The first statement cited by Plaintiffs is not actionable in any event because it is a general statement of opinion about a public matter (the success of the HAMP program). The second and third statements, viewed as a whole, are forward-looking, essentially predicting that the company would continue to profit despite HAMP and other government intervention programs. See Harris, 182 F.3d at 805 (holding that a company's claim that it was "well positioned" was a forward-looking statement "whose truth can only be known after seeing how [the company's] future plays out").

[14]In deciding a motion to dismiss based on the statutory safe harbor, the Court must consider "any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e); see Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999). Also, as previously noted, see supra note 5, the Court may "take judicial notice of relevant SEC filings." Thompson, 610 F.3d at 631 n.5.

other risk factors, Defendants referenced "fluctuations in customer demand" and "legislation or other changes in the regulatory environment, particularly those impacting the mortgage default industry." Id. These disclosures encompassed the same facts that Plaintiffs claim Defendants concealed and that ultimately led DJSP to lower its 2010 guidance: a system conversion by a major client that reduced the number of foreclosure referrals and a slowdown in foreclosures due to government intervention programs. See Ehlert v. Singer, 245 F.3d 1313, 1320 (11th Cir. 2001) (holding that cautionary language accompanying forward-looking statements satisfied safe-harbor statute because "the warnings actually given were not only of a similar significance to the risks actually realized, but were also closely related to the specific warning which Plaintiffs assert should have been given").[15]  Similarly,

_____

[15]Although Defendants' presentation included oral statements by Stern, see supra Part I.C., those statements were made contemporaneously with the slide presentation and were based largely on the written statements reflected in the slides. Under these circumstances, the Court finds that the cautionary language in the slide presentation satisfies the disclosure requirements for the written and oral forward-looking statements made during the presentation. See 15 U.S.C. § 78u-5(c)(1), (2).

In addition, Plaintiffs claim that Defendants held other roadshows in mid-May 2010 and further allege, "upon information and belief," that "Defendants repeated the optimistic representations made at the . . . conference in March, and did not alter their prior guidance for the quarter, nor for the year." DE 38 at 24. Even assuming arguendo that Defendants' statements at the mid-May roadshows did not include the required forward-looking-statement disclosures (as the statements at the March 16 conference did), Plaintiffs have not alleged these statements with the necessary specificity. See 15 U.S.C. § 78u-4(b)(1) (requiring complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"); Fed. R. Civ. P. 9(b).  Further, while Plaintiffs' allegations about the

DJSP's press releases of February 17, 2010, and March 11, 2010,[16] which also included the company's original 2010 earnings guidance, contained forward-looking-statement disclosures substantially identical to those in the March 16 slide presentation. Consequently, the forward-looking statements in the presentation and press releases are protected by the safe harbor. See 15 U.S.C. § 78u-5(c)(1).

The remaining statements alleged by Plaintiffs are oral statements that Stern and Gursahney made during a conference call with analysts on April 22, 2010. Plaintiffs claim that during this call, Gursahaney reaffirmed DJSP's original financial guidance for 2010, and Stern expressed his belief that this guidance was "conservative." Stern also stated that he was not overly concerned about HAMP and that DJSP was well positioned to adjust to, and even profit from, the procedures implemented by HAMP. The existing record does not show that these statements included the disclosures required by the safe-harbor statute. See 15 U.S.C. § 78u-5(c)(1)(A)(i), (c)(2). Nevertheless, the statements are entitled

---

statements at the mid-May roadshows are based on "information and belief," the Amended Complaint fails to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

[16] These press releases are publicly available on the SEC's website. See http://www.sec.gov/Archives/edgar/data/1436612/000121390010000486/f6k021010ex99i_djsp.htm; http://www.sec.gov/Archives/edgar/data/1436612/000121390010000879/f6k0310ex99i_djsp.htm. Although Plaintiffs' Amended Complaint states that the first of these releases was issued on February 17, 2010, see DE 38 at 21, the press release itself is dated February 10, 2010.

to protection if they were immaterial or if Plaintiffs' complaint does not permit a strong inference that Defendants made the statements with actual knowledge that they were false or misleading. <u>See</u> 15 U.S.C. § 78u-5(c)(1)(A)(ii); 15 U.S.C. § 78u-5(c)(1)(B); <u>Theoharous</u>, 256 F.3d at 1226.

With respect to Defendants' statements confirming DJSP's original guidance, the Court finds that Plaintiffs' allegations do not present a strong inference that Defendants made these statements knowing they were false.  When Defendants subsequently lowered DJSP's full-year guidance in late May 2010, the chief reason they cited for doing so was a system conversion by one of LODJS's largest clients, which reduced the number of foreclosure files referred by that client.  <u>See</u> DE 38 at 26 (statement by Stern on May 28, 2010, conference call that "<u>even more impactful in the short term</u>, one of our largest clients initiated a systems conversion following a recent merger that will impact foreclosure referral volume in the second quarter and may continue into Q3" (emphasis added)); <u>id.</u> at 27 (statement by Stern on same call that "this downward adjustment is directly attributed to a reduction in foreclosure case volumes by the impact of governmental intervention <u>and more accurately</u> by the system conversion delays at a major client we serve" (emphasis added)).  Even accepting Plaintiffs' claim that Defendants knew by the time of the April 22 call that foreclosures had slowed in the first quarter due to government intervention programs, Plaintiffs' allegations show that Defendants would <u>not</u> have known by then the full effect of the more

35

significant system-conversion issue.  According to Plaintiffs, Stern explained in late May that DJSP had learned of the system conversion sometime in April, that the conversion had reduced foreclosure volumes in April and May, and that it was unclear whether this temporary slowdown would continue into the third quarter.  See id. at 26.  Given that Defendants first learned of the conversion issue no more than three weeks before the April 22 conference call and that they remained uncertain about the ongoing effect of this problem even as of late May, the Court cannot conclude that it is "at least as likely as" not that Defendants actually knew on April 22 that DJSP could not meet or exceed its stated earnings guidance for the year.[17]  Tellabs, 551 U.S. at 328.

In arguing that Stern intentionally concealed the downturn in DJSP's processing business, Plaintiffs also point to "compelling facts that establish a motive and opportunity to commit fraud": the possible exercise of the Chardan and DAL warrants.  DE 45 at 15.  Because a sustained increase in the value of DJSP's shares would have ultimately expedited payment of the remaining money owed to Stern, the Court agrees that Stern had a financial incentive to present DJSP's business prospects in a positive light.  But this motive does not establish a strong inference of actual fraud, given that as of the April 22 call, Stern had limited knowledge about the effect of the client system conversion—the main reason for the

---

[17] For this same reason, the Court rejects Plaintiffs' invitation to draw a strong inference of actual fraud from the fact that Defendants waited until late May to revise DJSP's full-year guidance primarily as a result of the system-conversion issue.

slowdown in DJSP's core business.  <u>See</u> <u>Tellabs</u>, 551 U.S. at 325 (explaining that although "personal financial gain may weigh heavily in favor of a scienter inference," the "significance that can be ascribed to an allegation of motive . . . depends on the entirety of the complaint").  Moreover, although the Amended Complaint indicates that Stern retained a substantial equity stake in DAL (and therefore in DJSP's processing business), <u>see</u> DE 38 at 15, Plaintiffs do not allege that Stern attempted to sell any part of that interest while he was allegedly concealing the downturn in foreclosure referrals.  <u>See</u> <u>Mizzaro</u>, 544 F.3d at 1253 ("Stock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter; the lack of similar sales weighs against inferring scienter.").

Stern's other statements on the April 22 call—that he was not overly concerned by HAMP and that the company was well positioned to adjust to, and even profit from, that program's procedures—were immaterial.  Again, the Court accepts Plaintiffs' contention that Defendants would have known by April 22 that government intervention programs had negatively affected DJSP's business in the already ended first quarter.  Yet Stern's remarks conveyed no specific representations about that subject, only a general statement of his relative lack of concern with one of the government programs and broadly optimistic claims that DJSP was "well positioned" with respect to that program.  Reasonable investors would not attach significant weight to these vague comments.  <u>See</u> <u>Basic</u>, 485 U.S. at 240; <u>JP Morgan Chase Co.</u>, 553

F.3d at 206; In re XM Satellite Radio, 479 F. Supp. 2d at 180; see also Jabil Circuit, 594 F.3d at 796 ("The anti-fraud provisions of the securities laws are plainly disinterested with immaterial statements, no matter the state of mind of the speaker.").

In sum, the PSLRA's safe harbor precludes liability for all the forward-looking statements alleged by Plaintiffs. Accordingly, the Court will grant Defendants' Motion To Dismiss with regard to Defendants' statements about DJSP's financial prospects.[18]

**D.   Further Amendment of Complaint**

In their response to Defendants' Motion To Dismiss, "Plaintiffs request that they be afforded leave to amend in the event that the pending motion is granted in whole or in part." DE 45 at 20. This bare request is not sufficient to raise the issue of whether Plaintiffs should be granted leave to amend their complaint further. See Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." (internal quotation marks omitted)). In requesting leave to amend, a plaintiff must either attach a proposed amended complaint or at least describe the substance of the proposed amendments. See id.; Mizzaro, 544 F.3d at 1255 n.4. Because Plaintiffs here have not yet done so, the Court cannot

---

[18] Because Plaintiffs have not adequately pleaded a primary securities-fraud claim under Section 10(b) and Rule 10b-5, their controlling-persons claim under Section 20(a) likewise fails. See Mizzaro, 544 F.3d at 1237. Therefore, the Court need not consider the parties' other arguments about Stern's and Gursahaney's specific roles in the company and in the alleged fraud.

assess at this time whether further amendments should be permitted. See, e.g., Mizzaro, 544 F.3d at 1255-57 (affirming district court's denial of leave to amend because plaintiff's proposed amendments would be futile); Harris, 182 F.3d at 807-08 (same).

## IV.  Conclusion

For the reasons discussed, Plaintiffs' Consolidated Amended Complaint "fails to surmount the pleading hurdles that Congress has imposed on private securities fraud class actions." Mizzaro, 544 F.3d at 1257.  Therefore, the Court will grant Defendants' Motion to Dismiss (DE 44), and the above-styled cause will be dismissed without prejudice.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion To Dismiss (DE 44) be and the same is hereby **GRANTED**;

2. The above-styled cause be and the same is hereby **DISMISSED** without prejudice; and

3. To the extent not otherwise disposed of herein, all pending Motions are hereby **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this _30th_ day of September, 2011.

_____
WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

All Counsel of Record